OSAGE NATION OF INDIANS v.
UNITED STATES.

Appeals Docket No. 4.

United States Court of Claims.
May 1, 1951.

Wesley E. Disney, Washington, D. C., F. M. Goodwin and Lawrence H. Gall, Washington, D. C., on the brief, for appellant.

Ralph A. Barney, Oklahoma City, Okl., A. Devitt Vanech, Asst. Atty. Gen., for appellee.

Ernest L. Wilkinson and Robert W. Barker, Washington, D. C., and Aaron, Aaron, Schimberg & Hess, and Adams, Moses & Culver, all of Chicago, Ill., Ralph Montgomery Arkush, New York City, Theodore C. Bonney, Seneca Falls, N. Y., Brown, Dashow & Ziedman, and Dempsey, Mills & Casey, Chicago, Ill., Dykema, Jones & Wheat, Detroit, Mich., Earle & Reilly, New York City, Harrison, Thomas, Spangenberg & Hull, Cleveland, Ohio, Blake, Voorhees & Stewart, New York City, McCarter, English & Studer, Newark, N. J., Pam, Hurd & Reichmann and Pritzker, Pritzker & Clinton, Chicago, Ill., Riegelman, Strasser, Schwarz & Spiegelberg, New York City, and Washington, D. C., Sonnenschein, Berkson, Lautmann, Levinson & Morse, Chicago, Ill., Williamson, Hoge & Curry, Los Angeles, Cal., amici curiæ.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

This is an appeal by The Osage Nation of Indians from a final determination of the Indian Claims Commission, in which a majority of the Commission determined that the appellant was not entitled to any relief. Appellant's petition was filed with the Commission under and pursuant to the Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., hereinafter referred to as the Indian Claims Commission Act.

Appellant's claim, in essence, is for additional compensation, to be measured by the fair market value on September 29, 1865, of a tract of land approximately 30 miles wide and 50 miles long, consisting of 865,930.31 acres, in southeastern Kansas, which land was ceded to the United States by Article 1 of the Treaty of September 29, 1865, between the Osage Nation of Indians and the United States, 14 Stat. 687. Article 1 provided as follows:

"The tribe of the Great and Little Osage Indians, having now more lands than are necessary for their occupation, and all payments from the government to them under former treaties having ceased, leaving them greatly impoverished, and being desirous of improving their condition by disposing of their surplus lands, do hereby grant and sell to the United States the lands contained within the following boundaries, that is to say: beginning at the southeast corner of their present reservation, and running thence north with the eastern boundary thereof fifty miles to the northeast corner; thence west with the northern line thirty miles; thence south fifty miles, to the southern boundary of said reservation; and thence east with said southern boundary to the place of beginning: *Provided,* That the western boundary of said land herein ceded shall not extend further westward than upon a line commencing at a point on the southern boundary of said Osage country one mile east of the place where the Verdigris river crosses the southern boundary of the State of Kansas. And, in consideration of the grant and sale to them of the above-described lands, the United States agree to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians in the treasury of the United States, and interest thereon at the rate of five per centum per annum shall be paid to said tribes semi-annually, in money, clothing, provisions, or such articles of utility as the Secretary of the Interior may from time to time direct. Said lands shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws [including any act granting lands to the state of Kansas in aid of the construction of a railroad through said lands], but no pre-emption claim or homestead settlement shall be recognized: and after reimbursing the United States the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, the remaining proceeds of sales shall be placed

in the treasury of the United States to the credit of the 'civilization fund,' to be used, under the direction of the Secretary of the Interior, for the education and civilization of Indian tribes residing within the limits of the United States."

In its petition filed with the Commission, appellant asserted its claim under Section 2 of the Indian Claims Commission Act, which reads, in part, as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. * * *"

Although, in its petition, briefs and arguments before the Commission, appellant urged that its claim for relief was cognizable under all five clauses of Section 2, in its appeal to this court appellant relies only on portions of clause (3) and on clause (5). Appellant contends that the record before the Commission establishes conclusively the following three ultimate facts, any one of which would entitle appellant to the relief requested: (1) that there was a unilateral mistake of law or fact on the part of the Osage such as would justify the revision of the treaty under clause (3) of Section 2, in that the provision in Article 1 of the treaty relative to the creation of a civilization fund for Indian tribes other than the Osage but at the expense of the Osage, was not fully explained to, nor understood by, the Osage, but that, on the contrary, the cession of surplus lands in Article 1 was made with the understanding and belief on the part of the Osage that the proceeds from the sale by the Government of the ceded land, over and above the $300,000 advanced, plus the expenses of survey and sale, were to accrue to the benefit of the Osage Indians residing in the United States; (2) that in any event, the consideration actually passing to the Osage under Article 1 of the treaty, amounting to $300,000, or approximately 34 cents per acre, was unconscionable inasmuch as the land was worth at least what the Government received for it, that is, $1.25 per acre; (3) that the course of conduct pursued by defendant's agents in making the treaty and procuring the cession in Article 1 did not meet the standards of fair and honorable dealings within the meaning of clause (5) of Section 2.

The Commission based its denial of appellant's claims under clause (3) on two ultimate findings of fact: that the value of the land in 1865 did not exceed the sum of $300,000 paid, and that the terms of the treaty of September 29, 1865, particularly with respect to the civilization fund provision of Article 1, were fully explained to and understood by the Osage.

Upon these ultimate findings rests the Commission's disposition of the claim. Upon these or substituted conclusions upon the same issues must rest this court's decision. At the outset, therefore, it is necessary that we determine the extent of the authority of this court to review and to revise the findings of fact of the Commission before proceeding to analyze those findings in the light of the record, and to determine whether they should be modified to accord with what we perceive to be the facts as established by the record.

■ As stated in National Labor Relations Board v. Cheney California Lumber Co., 327 U.S. 385, 388, 66 S.Ct. 553, 554, 90 L.Ed. 739, "When judicial review is available and under what circumstances, are questions (apart from whatever requirements the Constitution may make in certain situations) that depend on the particular Congressional enactment under which judicial review is authorized."

Section 20 of the Indian Claims Commission Act of August 13, 1946, provides in part as follows:

"(b) * * * At any time within three months from the date of the filing of the determination of the Commission with the clerk either party may appeal from the determination of the Commission to the Court of Claims, which Court shall have exclusive jurisdiction to affirm, modify, or set aside such final determination. On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting 'fair and honorable dealings,' where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact. In making the foregoing determinations, the Court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error. The Court may at any time remand the cause to the Commission for such further proceedings as it may direct, not inconsistent with the foregoing provisions of this section. * * *

"(c) Determinations of questions of law by the Court of Claims under this section shall be subject to review by the Supreme Court of the United States in the manner prescribed by section 288 of this title."

After a hearing before the Commission, as provided for in the Act, the Commission made its final determination including findings of fact and conclusions of law, all adverse to appellants. Thereafter, pursuant to Sec. 20(b), quoted above, appellant appealed to this court from such adverse final determination.

This appeal raises the questions, (1) whether, on the whole record, the Commission's findings of fact, hereinabove, referred to, are supported by substantial evidence, and (2) whether the Commission's conclusions of law, including its conclusions respecting fair and honorable dealings, are valid and supported by the findings of fact.

Appellee has not provided us with much guidance as to what it considers to be the proper scope of our review of the Commission's findings of fact. It has merely pointed out that similar provisions as to judicial review of findings of facts on appeal appear in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., and various other acts governing the duties and powers of administrative and quasi-judicial tribunals. It mentions two Supreme Court decisions, one dealing with the scope of judicial review of facts under the National Labor Relations Act, and the other under the Federal Trade Commission Act,[1] and the excerpts quoted from each decision in the Government brief stresses the proposition that courts have repeatedly held themselves precluded from weighing the evidence in reviewing the Board's or the Commission's orders, and that if the orders are supported by findings based on substantial evidence, the courts are not free to set them aside, even though the administrative tribunal could have drawn different inferences from the record before it. The Government indicates that such decisions represent its

1. National Labor Relations Board v. Crompton-Highland Mills, Inc., 337 N.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, rehearing denied 337 U.S. 950, 69 S.Ct. 1512, 93 L.Ed. 1752; Corn Products Refining Co. v. Federal Trade Commission, 324 U. S. 726, 65 S.Ct. 961, 89 L.Ed. 1320.

views on the scope of our review of the Commission's findings of fact, and should serve as a guide to this court.

■ The exact scope of a court's review of the factual determinations or orders of a quasi-judicial or administrative tribunal and the application of the so-called substantial evidence rule, are by no means simple matters. The enabling legislation of such tribunals as the National Labor Relations Board, the Interstate Commerce Commission, etc., has uniformly revealed a Congressional intent to accord as much finality as possible to their determinations, orders and decisions, in order to insure an orderly and efficient administration of the various laws involved. Although, as conceded by the Government, the Indian Claims Commission is not very similar to the above mentioned Board and Commission, this same congressional intent, as we shall show more fully hereinafter, was equally present in the mind of Congress in framing the Indian Claims Commission Act, and we should not whittle away that very proper purpose, nor in any way undermine the effectiveness of the Commission by seeming to treat each appeal as a trial *de novo,* or by introducing an unduly broad concept of what constitutes substantial evidence. We are fully aware that there are limits to our review upon the record of the findings of fact made by the Commission, and we have carefully considered where those limits lie. In so doing we have studied the arguments and authorities referred to in the briefs of the parties, the opinions of the text writers on administrative law, dealing with the problem generally, and the legislative history of the Indian Claims Commission with respect to Section 20(b).[2]

■ There seems to be little unanimity in the court decisions as to the meaning of the expression "substantial evidence." It has meant everything from "warrant in the record," "rational basis," "not arbitrary," "some evidence," "reasonable," to what is commonly understood as being the preponderance of the evidence. We are convinced that the course Congress intended us to follow lies somewhere between those extremes.

The various theories as to the scope of review, ranging from very narrow to very broad, announced, by the courts, has by no means been a thoughtless or haphazard process, but rather, we think, an honest and considered attempt to give effect to Congressional intent as manifested in the particular legislation involved, and to preserve the dignity and effectiveness of the administrative tribunals whose decisions were under scrutiny. While, for a time, there seems to have been a trend in the courts to look only to see whether the finding of fact in question had *some* evidence to support it and if so, to sustain it even though the record contained masses of uncontradicted evidence to the contrary, those decisions were largely confined to certain specialized fields where the court, reviewing the findings of an expert body vested with discretionary and sometimes rate-making functions, was reluctant to substitute its relatively uninformed judgment for that of a trusted and experienced body of experts.

The problem of when to substitute judicial for administrative judgment is often a difficult one. Courts have refused to substitute their judgment for that of the administrative tribunals involved where the question concerned matters on which the courts felt that the agencies had by statute been vested with authority to exercise discretion or to establish policy, sometimes coupled with rule-making power. Securities and Exchange Commission v.

---

2. Cases and Materials on Administrative Law, by Milton Katz, 947: Administrative Law, Cases and Comments, by Walter Gellhorn, Chicago 1940; Report of the Atty.Gen.Com. on Adm.Procedure (1941) Stason; "Substantial Evidence" in Administrative Law, 89 U. of Pa.L. Rev. 1026 (1941); Atty.Gen.Com. on Adm.Procedure. Final Report; Symposium, 41 Columbia L.Rev., 585 (1941); The Scope of Judicial Review, Edson R. Sunderland, 27 Mich.L.Rev. 416 (1929); Scope of Review of Federal Administrative Action, Kenneth Culp Davis, 50 Columbia L.Rev. 559 (1950). The latter article by Mr. Davis, with its many references to other studies in this field, has been particularly helpful.

Central-Illinois Securities ·Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836. In such cases, even though the facts might be undisputed and the court might feel more favorably disposed to a different conclusion than that reached by the administrative tribunal, the courts have refused to reverse where the agency acted within its statutory authority. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260; Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. These cases also involved the so-called expert agencies such as the Interstate Commerce Commission, the Securities & Exchange Commission, the Federal Communications Commission, etc., and the test applied seems to have been reasonableness rather than rightness. In National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, the Court held that the question whether or not a person was an "employee" within the meaning of the National Labor Relations Act was a matter confined to agency discretion. In Unemployment Compensation ·Commission v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 250, 91. L.Ed. 136, the Court held that the question whether or not there was a labor dispute in active progress was a matter confined to agency discretion and because there was "warrant in the record" and "a 'reasonable basis in law'" to support the agency determination, the Court would not substitute its judgment regardless of its inclination to the contrary on the facts. However, in the same case the Court did not hesitate to substitute its judgment on the question of whether the labor dispute was *at the place of former employment,* apparently feeling that there was no agency discretion involved in the determination of such a question, nor any expertness required in reaching such a determination.

Courts have endeavored to distinguish carefully between questions which are properly the subject of expert and technical judgment in the hands of an experienced and informed agency, and ques-

tions of a more general nature concerning which the court is as competent an arbiter as the administrative body. In the former case, the courts have applied a very limited scope of review, and in the latter a much broader one. National Labor Relations Board v. Standard Oil Co., 2 Cir., 138 F. 2d 885. Where the question examined involves the common law, civil law, ethical questions, legislative history, *a priori* reasoning, the meaning of nontechnical words and concepts and the tradition and philosophy of law and government, the court rather than the agency is the expert body.

In determining whether a finding is supported by substantial evidence, courts are usually directed by the statutes and by the Administrative Procedures Act to examine the whole record. In Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126, the Court said of substantial evidence: "[It] is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Mr. Justice Black's dissent in National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660, in which the majority held that the evidence of a refusal to bargain was too insubstantial to form a basis from which the fact in issue could reasonably be inferred, makes some general observations which are significant in any approach to this problem. Speaking of such agencies as the Labor Board, the Interstate Commerce Commission, the Securities and Exchange ·Commission and the like, Mr. Justice Black said:

" * * * were all created to deal with problems of regulation of ever increasing complexity in the economic fields of trade, finance and industrial conflicts. Congress thus sought to utilize procedures more expeditious and administered by more specialized and experienced experts than courts had been able to afford. The decision here tends to nullify this Congressional effort."

In the Report of the Attorney General's Committee on Administrative Procedure,

the additional views of Messrs. McFarland, Stason, and Vanderbilt, suggested that courts had too frequently interpreted "substantial evidence" to mean any evidence to support the conclusion of fact regardless of how heavily the countervailing evidence might preponderate. The report goes on to point out that in any one agency some fact determinations may involve highly technical matters requiring special experience and training while others will involve technology to little or no extent:

"Some impinge heavily upon private rights; others do so lightly, if at all. Some are intended to be merely preliminary to the exercise of validly conferred administrative discretion; others involve no discretionary element but are quite objective. Some are rendered by long-established, well-tried tribunals in whom all persons have confidence; some come from new and hurriedly organized agencies. Yet, for the most part all these different types of fact determinations are cast into a single mold, with a single general formula for judicial review. * * *"

This last statement is, of course, literally true, since many of the statutes employ the same provision relative to the conclusiveness of the tribunal's determinations of fact if based on substantial evidence. However, in recent cases the courts have displayed a greater amount of flexibility in applying this general formula, depending upon the question involved, the technical or nontechnical aspects of the issue, the provisions of the particular statute, the make-up and length of existence of the administrative board, and many other pertinent considerations.

Just how flexible the application of the general formula should be, is itself a difficult problem. In its decision of January 15, 1951, in the combined cases, Niagara Hudson Power Corp. v. Leventritt (No. 211), and Securities and Exchange Commission v. Leventritt (No. 212), the Supreme Court reversed, 340 U.S. 336, 71 S.Ct. 341, 346, the Court of Appeals for the Second Circuit, 179 F.2d 615, which had held that the finding of the Securities and Exchange Commission concerning the value of warrants was not supported by any evidence.

The Court stated, in part:

" * * * The informed judgment of the Commission, rather than that of the market, has been designated by the Act as the appropriate guide to fairness and equity within the meaning of the Act. * * *

"In the absence of abuse of its discretion, the Commission's approval of a plan is as lawful and binding when it recognizes a value of zero for a security as when it selects any other figure. The cash allowance it gives to one security it must take from another. In each case, it must determine the fairness and equity of the plan to all who are affected. We conclude, therefore, that in the present instance the Act does not require proof that the warrants are wholly worthless and without all market value in order to sustain the Commission's judgment that the plan is fair and equitable when it denies participation to them. It is enough that the Commission, within its discretion, has given the warrants careful consideration and that under all the circumstances, including their market value, has found the plan to be fair and equitable within the meaning of § 11 of the Act [15 U.S.C.A. § 79k]."

In Universal Camera Corp. v. National Labor Relations Board (No. 40), 340 U.S. 474, 71 S.Ct. 456, 459, the Supreme Court considered the question whether the judicial review provisions contained in the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., and in the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., in any way altered the scope of judicial review. The Court noted that the Court of Appeals for the Second Circuit and the Courts of Appeals for five other circuits all agreed that no material change had been made in the reviewing powers, whereas the Court of Appeals for the Sixth Circuit in Pittsburgh S. S. Co. v. National Labor Relations Board, 180 F.2d 731, held that the scope of review had been considerably altered.

In the Universal Camera case, the majority opinion of the Court carefully re-

viewed and clarified the problem now before us. At the outset of the discussion of this matter it was stated:

"Want of certainty in judicial review of Labor Board decisions partly reflects the intractability of any formula to furnish definiteness of content for all the impalpable factors involved in judicial review. * *"

The Court then proceeds to review the history of the exercise of judicial reviewing power under the substantial evidence rule and points out that in many cases

"* * * Even though the whole record may have been canvassed in order to determine whether the evidentiary foundation of a determination by the Board was 'substantial,' the phrasing of this Court's process of review readily lent itself to the notion that it was enough that the evidence supporting the Board's result was 'substantial' when considered by itself. It is fair to say that by imperceptible steps regard for the fact-finding function of the Board led to the assumption that the requirements of the Wagner Act were met when the reviewing court could find in the record evidence which, when viewed in isolation, substantiated the Board's findings. * * *"

The Court further pointed out that this problem was of great concern to the Attorney General's Committee on Administrative Procedure, and quoted from page 92 of the Final Report, referring to proposals to enlarge the scope of review to permit "inquiry [as to] whether the findings are supported by the weight of the evidence". The Final Report contained the following:

"* * * Assuming that such a change may be desirable with respect to special administrative determinations, there is serious objection to its adoption for general application.

"In the first place there is the question of how much change, if any, the amendment would produce. The respect that courts have for the judgments of specialized tribunals which have carefully considered the problems and the evidence cannot be legislated away. The line between 'substantial evidence' and 'weight of evidence' is not easily drawn—particularly when the court is confined to a written record, has a limited amount of time, and has no opportunity further to question witnesses on testimony which seems hazy or leave some lingering doubts unanswered. 'Substantial evidence' may well be equivalent to the 'weight of evidence' when a tribunal in which one has confidence and which had greater opportunities for accurate determination has already so decided.

"In the second place the wisdom of a general change to review of the 'weight of evidence' is questionable. If the change would require the courts to determine independently which way the evidence preponderates, administrative tribunals would be turned into little more than media for transmission of the evidence to the courts. It would destroy the values of adjudication of fact by experts or specialists in the field involved. It would divide the responsibility for administrative adjudications."

The Court then noted that the three dissenting members of the Committee in their minority report recommended that Congress enact legislation requiring judicial review to be upon "the whole record" and that to that extent, at least, their report was adopted. As pointed out by Mr. Justice Frankfurter, speaking for the majority, it was in the same "mood" that amendments of the Wagner Act contained the same language:

"It is fair to say that in all this Congress expressed a mood. And it expressed its mood not merely by oratory but by legislation. As legislation that mood must be respected, even though it can only serve as a standard for judgment and not as a body of rigid rules assuring sameness of application. Enforcement of such broad standards implies subtlety of mind and solidity of judgment. But it is not for us to question that Congress may assume such qualities in the federal judiciary.

*    *    *    *    *    *

"It would be mischievous word-playing to find that the scope of review under the Taft-Hartley Act is any different from

that under the Administrative Procedure Act.

\* \* \* \* \* \*

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the sigificance of the requirement in both statutes that courts consider the whole record."

The Supreme Court then cautions that it should not be thought that courts must not give great respect to the specialized or technical findings of an informed and expert body, nor even that a court should displace an administrative tribunal's choice in a matter *not* requiring expertise even though the court might justifiably have arrived at a different result if the matter had been before it *de novo*.

"\* \* \* Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

The Court thus concluded that the judicial review provisions of the Administrative Procedure Act and similar language in the Taft-Hartley Act require that substantiality be determined in the light of all that the record relevantly presents. Further, the Supreme Court held that although no precise formula for the scope of judicial review was provided, both acts, in their actual wording and in the light of their legislative history, clearly place upon the courts the responsibility for the *reasonableness* and *fairness* of administrative tribunals' decisions, at least to a greater extent than some courts have in the past shown. The order of enforcement of the Board's order entered by the Court of Appeals for the Second Circuit was reversed and the cause remanded. On the same day in the case of National Labor Relations Board v. Pittsburgh Steamship Co. (No. 42), a second decision[3] of the Sixth Circuit, 180 F.2d 731, refusing enforcement of a Board order, was affirmed 340 U.S. 498, 71 S.Ct. 453, 456. In this case the Court said:

"\* \* \* The court painstakingly reviewed the record and unanimously concluded that the inferences on which the Board's findings were based were so overborne by evidence calling for contrary inferences that the findings of the Board could not, on the consideration of the whole record, be deemed 'substantial.' "

We now turn to a consideration of what Congress intended to be the scope of our review of the findings of fact of the Indian Claims Commission. The language used in Section 20(b) is similar to that of the language in the Administrative Procedure Act and that fact was noted specifically in the Conference Report (Cong.Rec. 7–27–46, p. 10454). The latter act had been recently enacted, however, and there had been no court decisions interpreting that particular portion of it. It is interesting to note that the Indian Claims Commission Act as originally introduced had no provision for a review of the Commission's findings of facts, but only of its conclusions of law. The original bill also provided, in Section 22(a), that the Commission's report of a final determination favorable to the claimant should have the effect of a final judgment and be paid in the same manner as are judgments of the Court of Claims. The Senate objected to this provision and passed an amendment which provided that the amount found due by the Commission should, upon appropriation therefor by Congress, be paid in

---

3. Previously, the decision of the Circuit Court denying enforcement of the Board order because of bias on the part of a Board trial examiner whose findings had all been adopted by the Board, had been reversed and remanded.

such manner as Congress should provide. The Department of Justice, however, felt that the awards of the Commission should have no such finality and proposed that the Commission's determinations should come back to Congress for a thorough review on the facts and for final action. Ultimately, the Department of Justice agreed that there should be a review of the Commission's findings of fact by the Court of Claims and also agreed to the finality of the Commission's determinations which were so subject to review. The Conference Report of July 27, 1946, in commenting upon these amendments, states in part:

"* * * In order to make perfectly clear the intention of both houses that the determinations of the Commission should, unless reversed, have the same finality as judgments of the Court of Claims, section 22(a) was rewritten to provide expressly that future Congresses may appropriate such sums as may be necessary to pay the final awards of the Commission. At the same time, in deference to the position taken by the Department of Justice that decisions of the Commission should be reviewable on the facts as well as on the law by the Court of Claims, appropriate amendments were made in section 20(b), 21 and 22, which apply to the Commission the forms of review embodied in the recently enacted Administrative Procedure Act. Under these provisions decisions of the Commission may be reversed (a) if the Court of Claims determines that the findings of fact are not supported by substantial evidence, or (b) if the Court of Claims finds an error in the law applied by the Commission. Under the latter heading the Court of Claims is empowered to reverse a decision of the Commission based upon the standard of 'fair and honorable dealings,' inasmuch as the interpretation of such a standard, written into the law of the land by this act, becomes an issue of law. The Court of Claims is likewise empowered to determine whether the findings of fact support the conclusion of the Commission. With these extensive review provisions the Department of Justice agree to withdraw objections earlier raised to the provision authorizing appropriation in payment of awards made by the Commission. (Rept.No.2693, 79th Cong., 2d sess., House of Representatives, Statement of the Managers on the Part of the House, p. 9; Cong. Rec., House, July 27, 1946, p. 10454.)"

It thus appears that it was at the instance of the Department of Justice that this court was ultimately directed to review judicially the findings of fact of the Commission, and the forms of review applied to the Commission's findings were those embodied in the Administrative Procedure Act.

In general the jurisdiction of the Indian Claims Commission does not embrace matters of a technical or highly specialized character. The Act sets forth no particular qualifications for the Commissioner except that at least two be attorneys and that not more than two be of the same political party. There was some discussion during the hearings of the advisability of providing that one member be an American Indian, but no such provision was made. The Act contains no language delegating to the Commission authority to perform any specified legislative function, when in the judgment of the Commission such action should be necessary to carry out the policy of Congress, so as to preclude a court's reviewing the Commission's judgment as to the existence of the facts calling for that action. The Commission is vested with no rate making or regulatory functions. Generally, and in this case in particular, the issues to be decided by the Commission involve ordinary matters—both legal and factual—concerning which this court is as expert as the Commission, that is, the market value of land, the meaning of language in a treaty, whether a certain course of dealings between the agents of the United States and the Indians amount to fair and honorable dealings, whether from the circumstances surrounding the treaty negotiations the existence of unilateral mistake concerning one provision can be fairly inferred. Inasmuch as the evidence before the Commission in this case was largely documentary, the opportunity of this court to evaluate such evidence is equal to that of the Commission. This is not a case where the commission was

faced with the necessity of weighing or evaluating conflicting evidence in order to make its findings of fact. If it were, our scope of review and power to modify such findings would be more circumscribed. Pollock-Stockton Shipbuilding Co. v. Brown, 7 Cir., 185 F.2d 37. For the most part the evidence in the instant case is documentary and is not conflicting and the problem presented is one of carefully examining a vast amount of material and from it drawing the soundest inferences.

Section 13(b) of the Act provides for the establishment of an Investigation Division to investigate all claims referred to it by the Commission, for the purpose of discovering the facts and submitting any evidence developed through its search to the Commission and the parties. From the papers contained in the record on appeal, it appears that no such investigation was made or, if it was, that the material developed was not considered by the Commission in reaching its decision since the Commission denied the request of appellants to make the report of the Division a part of the record on appeal. Therefore, we presume that the record before us is the entire record on which the Commission based its determination.

The primary facts contained in the record in this case were for the most part undisputed. Those facts were contained in depositions taken from individuals many years prior to the hearing, in official letters and documents of the Department of the Interior and the Indian Office, in Congressional documents, drafts of treaties from the files of the Indian Office, Acts of Congress in the form of statutes and resolutions, reports of Congressional committees, and the record of this court in the previous Osage case, (Osage Tribe of Indians v. United States), 66 Ct.Cl. 64. The facts in this record were not elicited from oral testimony of witnesses whom the Commission had an opportunity to hear and observe.

Inasmuch as the parties have joined issue upon the question of whether or not the Commission's ultimate findings were based upon substantial evidence, and it appearing that this court may properly review such findings and that upon such review the disposition of this case may largely depend, we proceed to a review of the facts as found by the Commission. In affirming, modifying or reversing the findings of the Commission, we shall be guided by the *criteria* furnished by the Supreme Court in the Universal Camera case, supra.

The primary facts found by the Commission in findings 1 through 7, and upon which it based its two ultimate findings,[4] will be summarized. Early in 1862 the Osage Nation and the United States commenced treaty negotiations looking toward the acquisition by the United States of portions of land in southeastern Kansas which had long been occupied by the Osage Nation. On August 29, 1863, a treaty was concluded which contained, among others, certain provisions for the cession to the United States of two tracts of land. At this point, the Commission quotes in full Article 1, as it appeared in this early draft of the treaty, providing for the sale to the United States of a tract of land in southeastern Kansas approximately 30 by 50 miles in size, for an outright price of $300,000, which sum was to be placed to the credit of the Osage Nation in the treasury of the United States and interest thereon to be paid to the Osage at the rate of five percent per annum. Article 2, also quoted in full, provided that a larger tract should be ceded to the United States in trust for the Osage and be sold for their benefit by the Secretary of the Interior under such rules and regulations as he might prescribe, the proceeds, less expenses incident to the execution of the trust, to be placed in the treasury of the United States to the credit of the Osage and interest thereon at the rate of five percent per annum to be ex-

4. 8. The value of the land ceded by said treaty did not exceed the sum of $300,000 at the time the 1865 treaty was concluded.
9. That the terms of the treaty of

September 29, 1865, were fully explained to and understood by the Indian representatives of the Osage Nation of Indians, who executed the same, at the time they signed it.

pended annually for certain specific purposes. Article 16, quoted in full, provided:

"Should the Senate reject or amend any of the above articles, such rejection or amendment shall not affect the other provisions of this Treaty but the same shall go into effect when ratified by the Senate and approved by the President."

The Commission's findings then state that the treaty was amended in several respects by the Senate and also at the request of the Osage, but that, in 1865, notwithstanding the provisions of Article 16, the then Acting Commissioner of Indian Affairs considered the changes in the treaty to be of such a character as to make the treaty "unfit for publication" and accordingly, with the approval of the Secretary of the Interior, he prepared another treaty embodying all the changes. This new draft of the 1863 treaty, "with slight amendments," was submitted to the representatives of the Great and Little Osage tribes of Indians at Fort Smith, Arkansas, in September 1865. The Commission found that this treaty was interpreted and explained to the representatives of the Osage at Fort Smith by an interpreter and that, after some deletions and interlineations, it was signed by the representatives of the United States and the representatives of the Little (Southern) Osage shortly before September 29, 1865; that the treaty was later submitted to the Great Osage (who had not been authorized to execute the treaty at Fort Smith) at Canville Trading Post in Kansas, where the terms were "fully explained to them by an interpreter," and that it was executed by the Great Osage on September 29, 1865; that the following statement appears before the signatures of the chiefs—

"We the undersigned, chiefs and headmen of the Clermont and Black Dog Band of the Great Osage Nation, in council at Fort Smith, Ark., have had the foregoing treaty read and explained in full by our interpreter, L. P. Chouteau, and fully approve the provisions of said treaty made by our brothers the Osages, and by this signing make it our act and deed." 14 Stat. 691.

The findings then point out that certain of the chiefs who signed the 1863 treaty also signed the 1865 treaty.

The findings then set forth in full Articles 1, 2, and 17, of the treaty signed on September 29, 1865, and finally proclaimed, after certain further amendments, on January 21, 1867. Another attestation clause is quoted with reference to certain amendments, dated September 21, 1866, and the Commission notes that the signatories thereto were the same chiefs and headmen who signed the original treaty.

In finding 6, the Commission states that the tract ceded to the United States by Article 1 of the treaty of 1865 comprised some 865,930.31 acres of land and that this land was sold by the Government "pursuant to the provisions of said article one"; that the sales began in 1868 and continued until 1901. The remainder of finding 6 is significant inasmuch as it is the basis for the Commission's conclusion that the market value of the land ceded in Article 1 was no more than 34 cents per acre in 1865. We shall discuss it in detail later in this opinion. In general, it finds that by the end of 1875 less than 50 percent of the land in the Article 1 tract had been sold and that no land was sold during 1876. It then points out that on August 11, 1876, 19 Stat. 127, Congress passed an act providing for the sale of these lands at $1.25 per acre on a four year installment basis and that following the passage of this act 454,652.48 acres were sold between 1877 and 1880; that the cash proceeds from sales after 1880 indicate that the remaining acreage was sold during the next twenty years. In the latter part of finding 6, the Commission finds that gross proceeds from the Government sales of the land amounted to $1,101,303.78, "out of which the Government retained the purchase price, $300,-000.00," plus $24,373.20 also retained to cover the cost of survey, and that the balance of $776,931.58 was placed to the credit of the Civilization Fund; that $3,177.22 was paid out of this fund to cover the expenses of sale of Osage land, leaving $773,754.34 in the fund; that the entire fund was used for the benefit of Indians other than Osage, except for $189.55 which

was spent for the Osage and $248.78 which was returned to the United States Treasury. In Finding 7, the Commission found that the $300,000 specified in Article 1, was set up in the Treasury Department on about February 13, 1883, as a fund to the credit of the Osage; that interest on this fund of $15,000 annnually has been paid since 1867 and has aggregated more than $1,200,000.

### Claim of Unilateral Mistake

Under Section 2 of the Indian Claims Commission Act, "unilateral mistake" is a ground for the reformation of a treaty. If unilateral mistake is involved here, it is that the Osage, because of their disadvantageous position, complete ignorance of the English language and of the white man's customs, inexpert interpreters and lack of the necessary words in their very limited language to convey the true significance of the language used and the legal concepts involved, did not understand the effect of the treaty they accepted.

The fact of a person's understanding or lack of understanding of a matter, is ordinarily shown judicially by his expressions and actions at the time the matter took place. In the instant case no record was kept of the proceedings either at Fort Smith or at Canville Trading Post, where such expressions or actions might have been noted. The Commission had no opportunity to hear and observe witnesses who had been present at such proceedings and, in this connection, had to depend on written depositions of persons who were not present during the negotiations, either because they were not yet born or were too young at the time, and whose impressions were at best second or third hand. For whatever it may be worth, such persons deposed uniformly that the Osage had not understood the Civilization Fund provision.

Aside from these depositions, to which the Commission apparently attributed no weight, the record consists of the various versions of the treaty from 1863 to 1867 when it was proclaimed, letters and documents from the files of the Department of the Interior and the Indian Office, and certain undisputed facts concerning the history of the times and the nature of the parties involved. We do not believe that the record before the Commission and now before us, justifies the fact inferentially found by the Commission that the civilization fund provision was fully explained to and understood by the Osage Tribes. In its opinion, on the question of unilateral mistake with respect to the meaning of the civilization fund provision in Article 1, the Commission concludes that "the record discloses no deception, over-reaching or other perverse conduct on the part of the representatives of the Government, either in the preliminary discussions or in the actual consummation of the treaty." The Commission concedes that the Osage were full-blooded, blanket Indians, few of whom could read or write, that they had little knowledge of English, that they were destitute and very anxious to make a treaty in order to secure funds. However, the Commission feels that because the unproclaimed treaty of 1863 provided in Article 1 for an outright cession of this land for $300,000, the Osage must have understood that the revised Article 1 in the treaty submitted to them in 1865 also provided for an outright cession. The Commission reasons that the civilization fund provision was actually of no particular interest to these Indians or to the Government, since the land was being sold outright for a fixed sum and it was no concern of the Indians how the proceeds from the sale of the lands were to be disposed of as long as they got the $300,000. The Commission states that the record does not show how much time was spent on treaty negotiations at Fort Smith, but that three hours were consumed in negotiations a few days later at Canville. Admitting that three hours may be a short time to make such a provision clear to Indians who spoke no English and had no words in their vocabulary to express the words "civilization fund," "other Indians," etc.; that the Great Osage were not authorized to sign the treaty at Fort Smith, and that no record of the negotiations there are in existence, the Commission nevertheless states " * * the preliminary negotiations and terms of

the treaty were agreed upon at Fort Smith, at which place the Great Osage were represented, and, for ought that appears to be the contrary, the Great Osage representatives took part in the parley and understood the terms of the treaty."

The Commission appears to rely heavily on the previous negotiations relating to the 1863 treaty and its amendments, as a basis for its conclusion that the Osage never intended to do other than sell outright the 30 by 50 mile tract for $300,000 and that they either fully understood the civilization fund provision inserted in the 1865 draft, or were not interested in such a provision. In commenting on the decision of this court in 66 Ct.Cl. 64, involving the same claim, wherein the court found and concluded that the Osage did *not* understand the meaning of the civilization fund provision, but rather believed that the expression "Indians in the United States" referred to the *Osage* Indians in the United States, the Commission states that the evidence relating to the 1863 treaty negotiations was never brought to the court's attention and that such facts would have had a direct bearing upon the statements made by the court with respect to mistake, although not upon its determination of the jurisdictional question, that is, that the court could not revise the treaty as written.

It is true that certain documents, such as the 1863 treaty itself, the Senate amendments reported in the Senate Executive Documents, letters from the official files of the Department of the Interior, were not introduced in evidence as exhibits, as they were in the present case. However, all of those documents, letters, and the 1863 treaty and its amendments, were quoted in full and were discussed in the briefs of the parties and to that extent were before the court for its consideration. Much of this material, once called to the court's attention, was material of which the court could take judicial notice, and we must presume that the court considered such matters in concluding that the Osage did not understand the terms of the civilization fund provision, regardless of the fact that no findings were made relative to such

documents and the material was not referred to in the court's opinion. As recognized by the Commission, this material could not have affected the court's final determination which was that it did not have jurisdiction under the special act of Congress to revise the treaty for unilateral mistake. Actually, the facts relative to mistake presented to the Indian Claims Commission in the form of documentary evidence, and the facts before this Court in the earlier Osage case, are in most respects identical. The court's conclusion in the earlier case that there had been a mistake, was ineffective on the matter of relief, since the court had no power at that time to revise the treaty for mistake. Under the Indian Claims Commission Act, however, a treaty may be revised for unilateral mistake, and we shall therefore review briefly all the facts revealed by the record in the instant case and bearing on that matter.

In 1862 the Osage Indians were destitute. Their annuities from the Government under earlier treaties had ceased. The growth of white settlements in the immediate vicinity of their lands, particularly in the southeastern part of Kansas, and the turbulent conditions in that area resulting from the Civil War, had driven off the wild game on which the Osage depended largely for a livelihood. While the Osage were not a particularly warlike or hostile tribe, they were at best semi-civilized and completely unlettered. They were land-poor and were most desirous of disposing of some of this asset for funds with which to relieve their great distress. The State of Kansas and the United States Government were equally eager to have Indian title to land in Kansas extinguished and to have the Indians moved elsewhere, particularly in the case of southeastern Kansas where the railroad companies and the settlers were demanding an opportunity to obtain the land. In the early negotiations in 1862, the Osage had at first objected to ceding their lands in trust for the reason that by such a procedure they would receive no money until the lands were surveyed and sold. Their need was immediate and they preferred to make an outright

sale of some of their land at least. The treaty finally agreed upon in 1863 provided for such an outright sale of the most desirable portion of their holdings in southeastern Kansas—a tract approximately 30 by 50 miles in size—for $300,000 (Article 1). Article 2 of the treaty provided for a cession in trust for sale for the benefit of the tribes, of a much larger tract adjoining the first and extending far to the west, which was to be sold under such rules and regulations as the Secretary of the Interior might prescribe, the proceeds of such sale to be used for the benefit of the Osage Indians. The treaty also provided for a diminished reserve to which the tribe was to withdraw. The remainder of this early treaty provided that the 16th and 36th sections of land ceded by Article 2, were to be donated to the State of Kansas for school lands and that the Osage were to be paid 25 cents per acre for such lands. One section of the land described in Article 1 was to be given to Father Schoenmaker for the Catholic Mission and the priest was to have the privilege of selecting two additional sections in this tract for which he should pay 50 cents per acre. All settlers who were already on Article 1 and Article 2 lands might, within one year of ratification of the treaty, buy their lands for $1.25 per acre to the extent of a quarter section each. Tribal debts were to be paid to the extent of $30,000. One section of land was to be given to Charles Morgrain and $500 paid to him. Five hundred dollars each was to be paid to the chiefs and headmen of the Osage tribe yearly. No homestead or pre-emption rights were to be thereafter recognized on Article 1 lands except by direction of the President. Father John Schoenmaker was to be permitted to select two sections of land from the diminished reserve to be granted to him in fee simple for a school. Darius Rogers was to have the 160 acres on which were located his mill and improvements, in fee simple with the privilege of purchasing the quarter section adjoining such land for 50 cents per acre. Joseph Swiss, a half-breed tribal interpreter, was to have the half section on which his house stood and an additional half section of land in the trust tract.

On July 2, 1864, the Senate changed Article 2 to provide that the land should be surveyed and sold under the direction of the Commissioner of the General Land Office. Further amendments eliminated Article 3 providing for the donation of trust land to Kansas for school purposes; the price of the land which Father Schoenmaker was to be allowed to select from the trust lands was changed from 50 cents per acre to $1.25 per acre; Article 6, providing for the payment of tribal debts, was eliminated; the Article 10 grant in fee simple of two sections to John Schoenmaker, was changed to a grant of one section in trust with the proviso that when the land was no longer used for a school, it should revert to the United States and the Osage; Article 11 was changed to provide that the 160 acres to Darius Rogers on which his mill stood, must be paid for at $1.25 per acre, and the price at which he might purchase the adjoining quarter section was raised to $1.25 per acre. With these changes the Senate consented to the ratification of the treaty, but for some reason, the treaty was again submitted to the Osage, who according to a letter from the Acting Commissioner of Indian Affairs, wished further changes made. In the opinion of the Commissioner, the resulting treaty was "unfit for publication," and with the consent of the Secretary of the Interior, a new draft was prepared which purported to be the original treaty with the amendments of both the Senate and the Indians. It was this new draft that was submitted to the Osage at Fort Smith, Arkansas, just prior to September 29, 1865. In this new draft which was signed by the Osage at Fort Smith and later at Canville Trading Post, the following additional changes appeared. In Article 1 the western boundary of the ceded lands was limited to a natural marker at the request of the Osage and the expression "thirty miles" was eliminated. For the first time the provision relating to the disposition by the Government of the ceded lands and the civilization fund provision appears in the treaty. This was

neither a Senate amendment nor a change requested by the Osage. With respect to the lands for the Catholic Mission, this new draft provided that the selections should be held *in trust,* and that the selections made would be subject to the approval of the Secretary of the Interior instead of the Commission of Indian Affairs. The article providing for the payment of $30,000 of the Tribal debts, which the Senate had stricken in 1864, was reinstated at the request of the Indians, but the amount that could be paid was limited to $5,000. Since Charles Morgrain had died, the 1865 draft provided for the *heirs* of Morgrain, and the cash payment of $500 to Morgrain was eliminated. The draft eliminated the yearly payments of $500 to headmen. The material contained in Article 9 of the 1863 treaty forbidding the recognition of homestead and pre-emption claims in the future on the Article 1 land was incorporated in Article 1, and Article 9 was eliminated. Since Joseph Swiss had died, provision was made for his heirs. Two new articles were added providing that, Article 15 the Osage might unite with any tribe at peace with the United States in the Indian Territory, with provision for the proportionate payment of annuities; and, Article 16 that if the Osage should move to the Indian Territory, their diminished reserve should be disposed of in the same manner as provided in Article 2 for the trust lands.

Up to this point in the treaty negotiations we find no concrete evidence to indicate that the Osage understood the provision in the new treaty that the lands, which they were admittedly willing to sell outright for $300,000 in 1863 and 1864, were to be disposed of by the Government and the proceeds used for the benefit of all other Indians in the United States. Is there anything in these prior negotiations which would justify an inference that the Osage understood this provision? With respect to the other new features appearing for the first time in the 1865 draft, it is noted that they were either plainly for the benefit of the Osage (requiring payment of $1.25 per acre for land instead of giving it away or selling it for less) or were to take care of such matters as the death of someone whom the Osage had wished to benefit. It is reasonable to assume that the Osage understood these changes and may have proposed some of them. The civilization fund provision, under the Government's intention that it be used for other tribes, in no way benefited the Osage. It did not originate in the Senate. The mere fact that the Osage had agreed previously to sell this Article 1 tract outright does not, in our opinion, justify the inference that they fully understood and agreed to the civilization fund provision as it was written and submitted to them for the first time at Fort Smith. The natural inference would seem to be that if the Osage Indians had fully understood the literal meaning and effect of this provision they would have objected to the use of the funds derived from the sale of lands long owned by them for the benefit of other Indian tribes, to the extent that such funds were in excess of the $300,000, plus expenses of sale. It would be difficult to infer that the Osage, who were practically destitute, were so generous as to wish to authorize the Government to pay them only $300,000 for lands that were worth much more and to use the excess received from the sale of such lands for the benefit of Indian tribes other than the Osage, with some of whom the relation of the Osage were definitely hostile.

If, as found by the Commission, the civilization fund provision, which was an entirely new one, was fully explained to and understood by the Osage, the facts justifying such a conclusion must be found in what happened either at Fort Smith, or at Canville, on September 29.

The council attended by the Osage at Fort Smith, Arkansas, in September 1865, was not merely a council of the Osage Nation called to execute a treaty of cession for the Osage. It was a council of *all* the southwest Indian tribes called by the United States for the purpose of attempting to remedy a number of difficult situations arising from the recently ended Civil War wherein a number of the tribes, or parts of them, had participated on the side of the Confederacy. On July 31, 1865, Presi-

dent Johnson appointed a number of Commissioners to negotiate with the southwest Indians under the instructions of the Secretary of the Interior. Those instructions, embodied in a letter dated August 16, 1865, directed the Commissioners to negotiate treaties with the various tribes for permanent peace and amity with each other and with the United States. The Secretary's letter pointed out that a number of the tribes had, by allying themselves with the Confederacy, forfeited their rights to annuities and lands under their then existing treaties, Act of July 5, 1862, 12 Stat. 528, and that it was the desire of the United States "to reestablish order and legitimate authority among the tribes, encourage them in peaceful and industrial pursuits, and secure to them the benefits of Christian civilization, as the only means of attaining permanent prosperity and well-being." Agreements were to be made with the tribes located within the Indian Territory for the organization of civil governments and for the establishment of a common or central government. Slavery was to be abolished among the Indians and it was directed that the treaties must recite that the institution would never again exist among the tribes in any form. The Secretary's instructions noted that in certain tribes, internal dissension because of divided allegiance during the Civil War had been such that it might be impracticable to reconcile the factions to each other, in which event a division of funds, annuities and land might be made and the two factions thereafter treated as independent tribes. The Commissioners were instructed to attempt to negotiate treaties whereby the Kansas Indians would all be removed from Kansas to the Indian Territory, and there was transmitted to the Commissioners certain treaties already negotiated with the Kansas Indians but unratified or unproclaimed. With respect to the tribes which had joined with the Confederacy, the Commissioners were told to remind them that the President was authorized by Congress to abrogate all treaties with them, but that he was disposed to treat them liberally and would give them value for any land they might

cede to the Government. The loyal bands (including those wherein a majority of the members had remained loyal) were to be commended for their loyalty and the Commissioners were further authorized to recognize in some appropriate manner their services to the Government during the war. The Commissioners were told to insist upon cessions of all land not needed for tribal use, but they were cautioned to be fair and just in their dealings, and were advised specifically that they might agree in the treaties that "no part of such ceded lands shall be appropriated to Indians not on friendly relations with the party making the cession." The letter of instructions contained other directions, all accompanied by injunctions to be fair and just, but to use all proper means to persuade the Indians to remove from areas near white settlements and near the "great routes of travel."

From the above, it is clear that the consummation of the Osage treaty of cession comprised only a very small part of the task facing the Commissioners at the Fort Smith Council. Careful records were kept of all negotiations relative to the signing of the treaties of peace and amity with the various tribes, including the Osage, some of whose bands had joined with the Confederacy. Some of the Osage Indians had never returned to the tribe but had gone to Canada and Mexico. However, no record whatsoever was kept of the negotiations involving the Osage treaty in suit. Representatives of the Little Osage tribe and the two bands of the Great Osage tribe who had remained loyal to the Government attended the Fort Smith council but were not authorized to sign the treaty of cession, and the treaty was accordingly only signed by the chiefs and some of the members of Clermont's and Black Dog's bands of Great Osage. There was no record kept of the proceedings of this council and the length of time spent in council is not known. Any conclusion made from the record of the negotiations and meetings in Council that the treaty was explained to and understood by the Osage at the Fort Smith council, would be mere supposition.

The council at Canville Trading Post in Kansas, on September 29, with the Northern Osage, was of three hours duration and several Osage who signed at that council had apparently not even been present at Fort Smith. Again no record was kept or report made of the discussions of the Commissioners with the Indians. The attestation clause, quoted in the Indian Claims Commission's finding 3, is, we think, of little significance with respect to the understanding of the Osage signing at Canville. In spite of the fact that the clause states that Clermont and Black Dog are signing a treaty "made by our brothers, the Osages," those brothers did not in fact sign the treaty until several days later at Canville and a number of those signers had not even been at Fort Smith.

None of the Osage chiefs could speak or understand English. The two interpreters, L. P. Chouteau, who acted at Fort Smith, and Alexander Beyett, who acted at Canville, were half-breeds whose competence as interpreters was at best doubtful. We know that about twelve days of the Fort Smith General Council were spent in negotiating the treaty of amity. There were, however, many other treaties, other than the Osage treaty, negotiated during that time. It is likely that the Government's general purposes and intentions, as outlined in the letter of the Secretary of the Interior, were made known to the various tribes. One of the purposes of the council was to persuade certain tribes which had more land than they needed, to make cessions to the United States so that the land might be sold to friendly tribes who were to be moved from other places and needed land. In this connection the Commissioners were told to assure the tribes and in fact to agree, that in making such cesions, their land, upon receipt by the Government, would *not* be used for the benefit of any tribe not friendly to the tribe making the cession. The civilization fund provision in suit did not purport to give or sell Osage ceded lands as such to tribes unfriendly to the Osage, but it did provide for the sale of such land and the use of the proceeds therefrom for the benefit of *all* Indians, which would necessarily include certain tribes and bands of Indians with whom the Osage were on distinctly unfriendly terms. In spite of the paucity of the Osage language, the probable incompetence or inexpertness of its interpreters, and the wild nature of the tribe itself, this proposal could have been *explained* to them, given enough time. It seems highly unlikely, however that in the circumstances it would have been possible to *pursuade* the Osage to *agree* to any such proposition. As was pointed out by this court in the earlier Osage case, supra, the treaty was unique in this respect. Such an innovation in treaty making might have been accomplished without question or objection from the Indians only if the tribe in question had been extremely enlightened and civilized and was inclined to view their tribe and other tribes as one big family, or on the other hand, if the tribe were intensely ignorant and had no real idea of what they were doing. The Osage Indians were neither enlightened nor civilized.

After the signing of the treaty at Canville Trading Post, the treaty was submitted by Superintendent Sells to Commissioner Cooley, and later by Commissioner Cooley to the President for submission to the Senate. In the accompanying summaries of the terms of the treaty, no mention whatsoever was made of the civilization fund provision although all other provisions were carefully noted. In 1866, the Senate undertook to make certain amendments to this treaty. In Article 2 the amendment provided that the trust lands should be sold for $1.25 per acre under the direction of the Commissioner of the General Land Office, whereas the treaty as signed had left the price and manner of sale up to the discretion of the Secretary of the Interior. These same terms applied to the sale of the diminished reserve lands, should the Osage decide to move to the Indian Territory. The Senate did make one amendment in the civilization fund provision relative to a certain railroad grant to the State of Kansas, which will be discussed hereinafter. These amendments were submitted to the Osage

who agreed to them. The Osage were most anxious that their treaty be proclaimed so that they might have some benefit from it. They had already withdrawn from the trust and ceded lands and settled on their diminished reserve and yet, although the whites had swarmed onto the ceded lands and the trust lands, no money or other benefits had come to the Osage. Letters in the spring of 1866 from John Schoenmaker, who was in charge of the school and mission on the reserve, and Elijah Sells, Superintendent, evidence the bitter dissatisfaction and impatience of the Osage at this state of affairs. The first official mention of the civilization fund was made *after* the Senate had ratified the treaty with amendments in 1866, in the Annual Report of the Commissioners of Indian Affairs for 1866. In this connection, the report states:

"After the Government has been reimbursed the cost of the land and of the survey and sale, the balance realized is to be used by the Government as a fund for the civilization of Indians generally— a most beneficent provision, which is thus happily secured."

We do not believe that the acquiescence of the Osage in the various *Senate* amendments indicates their understandings of and agreement with the civilization fund provision of the treaty. Nearly all the Senate amendments were for the benefit of the Osage and there was every reason for their approval of them.

■ The fact that the Osage were willing to sell the tract described in Article 1, for $300,000 outright, because that was the amount offered by the Commissioners, does not necessarily mean that they would have done so had they understood the purposes for which the land or the proceeds therefrom was to be used, particularly when those purposes were calculated to be of no benefit to the Osage but for the benefit of tribes who were their traditional

enemies. This provision for a General Civilization Fund was not a Senate amendment and was not authorized by any statutes, and presumably the inclusion of a provision therefor in the treaty by the Government agents would have to be negotiated in the particular case with the Osage. We cannot agree that this provision in the treaty was of no concern to the Osage, although the Government agents may have thought so. No Osage has ever admitted to understanding this provision, and it certainly concerned the lands being ceded. What statements there are of record by those who were in any position to know, indicate that the Osage believed that the proceeds from the sale of this land were to be used for the civilization of the Osage Indians. All changes made in the treaty by the Senate between 1863 and 1865 (and later) were for the protection of, and resulted in additional benefits to, the Osage. While this civilization fund provision did not take anything away from the Osage which had been granted in prior drafts of the treaty, it would have been natural and understandable for the Osage to have believed that it, like the other changes, meant *additional* benefits to them.[5] What evidence there is in the record shows, in our opinion, that the provision was not fully explained to the Osage and that they completely misunderstood its operation. We, therefore, conclude, from the entire record, that the finding of the Commission that this provision was fully explained to and understood by the Indians is not supported by substantial evidence.

### Unconscionable Consideration

■ Appellant contended before the Commission and repeats the contention in this appeal, that, assuming there was no mistake on the part of the Osage with respect to the civilization fund provision, the consideration paid by the Government for the 865,930.31 acres ceded by Article 1

---

5. With respect to the phrase "Indians in the United States," it should be noted that some Osage who had been aligned with the cause of the Confederacy, had fled to Mexico and Canada and had not returned. If the phrase meant anything to them, the Osage probably thought that their departed brothers who had left the country were not to share in the treaty benefits.

of the treaty, was so out of line with the then fair market value of the land as to be unconscionable. The Commission has found (finding 8) that the value of the land in 1865 did not exceed the sum paid, that is, approximately 34 cents per acre. The primary findings upon which this ultimate finding is based are finding 2 and finding 6. Finding 2 relates to the treaty of August 29, 1863, and the Commission concludes that the Osage Indians' apparent willingness to take $300,000 for this land in 1863 is good evidence to the effect that $300,000 was the market value of this land in 1865. What an ignorant and impoverished band of blanket Indians was willing to take in payment for land is not, we think, conclusive as to its true value. The Commission, however, appears to rely principally on the facts set forth in finding 6, regarding the actual sale of these lands by the Government. The pertinent parts of this finding are as follows:

The land sales began in the calendar year 1868 and continued until as recent as the year 1901. The sales for the period from the calendar year 1868 to and including the fiscal year 1875 were as follows:

|  | Acres |
|---|---|
| Calendar year 1868 | 21,902.60 |
| Calendar year 1869 | 46,029.80 |
| Calendar year 1870 | 145,687.11 |
| Calendar year (first half) 1871 | 140,954.08 |
| Fiscal year 1872 | 2,667.10 |
| Fiscal year 1873 | 240.58 |
| Fiscal year 1874 | 320.00 |
| Fiscal year 1875 | 240.00 |

The acreage so sold aggregated the total of 358,041.27 acres. No land was sold during the 1876 fiscal year.

On August 11, 1876, 19 Stat. 127, Congress passed an act providing for the sale of the ceded lands at $1.25 per acre and giving purchasers the privilege of paying one-fourth of the purchase price at time of entry and the balance spread over a period of three years. Following the passage of this act the sales for the four years ending with 1880 fiscal year aggregated 454,652.48 acres, as follows:

|  | Acres |
|---|---|
| Fiscal year 1877 | 267,377.54 |
| Fiscal year 1878 | 164,785.62 |
| Fiscal year 1879 | 15,939.00 |
| Fiscal year 1880 | 6,550.32 |

During the next twenty years the acreage sold is not shown by the evidence, but the cash proceeds from sales is shown for this period and indicates the sale of the remaining land.

In its opinion, the Commission states with respect to the value of the land as evidenced by the sales:

"* * * The evidence submitted by the petitioner shows that the ceded lands comprised a large area of fifteen hundred square miles, or 865,930.31 acres. It was opened for settlement in the year 1868, during which year only 21,902.60 acres were sold, in the year 1869 there were 46,029.8 acres sold, in the year 1870 the sales amounted to 145,687.11 acres, and in the year 1871, there were sales amounting to 140,954.08, acres. During the four-year period from 1872–1875 only 3,467.68 acres were sold, and in the year 1876 there were no sales. So, during the first nine calendar years after the sales started, less than half or only 358,041.27 acres of the ceded lands were disposed of, and at an average cash price of about $1.25 per acre.

"On August 11, 1876, *apparently for the purpose of stimulating sales,* Congress passed an Act, 19 Stat. 127 allowing purchasers to buy at $1.25 per acre and pay one-fourth at the time of entry and spread the balance over a period of three years, so during the next four fiscal years, 1877–80, 454,652.48 acres were sold, but the sale of the remaining part of the cession (53,236.56 acres) took about twenty more years. [Emphasis supplied.]

"* * * the $300,000 paid by the Government for the ceded lands was not grossly inadequate, in truth, the slow sales during the first nine years following the opening of the area for entry indicates no great demand for the land. The first years of that period, 1868 and 1869, during which it would be reasonable to expect the greatest demand, the sales were exceed-

ingly light, so it might well be said that the purchase price was not inadequate at the time of the cession in September 1865, and in any view of the evidence the purchase price of $300,000 was not so palpably low as to shock the conscience and convince the judgment of its unconscionableness."

▌ In arriving at a fair determination of the market value of tribal lands, this court has often taken into consideration the prices at which the land sold, the extent of the demand, the quality of the land, and its use at the time. It has also considered the price paid by the Government for similar land at about the same time under treaties with other bands of Indians, and the prices paid by persons other than Indians buying similar land in the locality from private citizens. The Commission's findings make no mention of any of these elements of value except the lack of demand and the slowness of Government sales of this particular land. If the whole record contains substantial evidence as a basis for this finding, the Commission's finding and conclusion must be upheld. However, the Act of August 11, 1876, mentioned by the Commission in its findings and opinion, raises the curtain on a very different story than the one indicated by the Commission. That story, contained in the act itself, in other related acts and resolutions of Congress, in debates in the Senate and House of Representatives, in at least one famous lawsuit terminating in the Supreme Court, and material contained in Senate Executive Documents, reveals facts of which judicial notice may be taken.

A reading of the Act of August 11, 1876, reveals that if it was passed to stimulate sales of the ceded lands, it was to stimulate sales by the Government of land that had already been sold once and of land already settled by persons who for some reason had been unable to perfect their titles. The background of this act is particularly significant in connection with the fate of the land embraced in Article 1 of the Treaty of September 29, 1865, during the period from 1868 to 1875.

First, it should be noted that the land in question was a portion of the land which had been reserved to the Osage "so long as they may choose to occupy the same" by the Treaty of June 2, 1825, 7 Stat. 240. On December 8, 1862, Senator Lane of Kansas gave notice in the Senate of his intention to ask leave to introduce two bills. One bill provided for the appropriation of such portions of the public lands of Kansas "for purposes of internal improvements as shall equal what has heretofore been granted to other new States." The bill provided for the granting of land to the State of Kansas to promote the construction of railroads and telegraphs in the State and included specifically in the grant itself was most of the ceded tract later described in Article 1 of the treaty in suit. The act provided, 12 Stat. 772, for a grant of lands to Kansas in alternate (odd-numbered) sections to aid in the construction of railroads and a telegraph line from Leavenworth by way of Lawrence via the Ohio City crossing of the Osage River to the southern line of the State in the direction of Galveston Bay in Texas, with a branch from Lawrence by the valley of the Wakarusa River to the point on the Atchison, Topeka, and Santa Fe Railroad where that road intersects the Neosho River, and of another railroad from Atchison via Topeka to the western line of the State in the direction of Fort Union and Santa Fe, New Mexico, with a branch from where that road crossed the Neosho, down the Neosho Valley to the point where the first road enters the Neosho Valley. The two roads thus crossed near the middle of the ceded tract. The act provided that the State of Kansas was to have every alternate section of land designated by odd-numbers for ten sections in width on each side of the roads; that the two railroad companies should have 10 years to complete their roads; that if, when the lines were definitely located, the United States had disposed of any portion of the land included in the grant, or that rights of pre-emption or homestead had attached to such granted land, or that such land had been reserved by the United States for any

purpose, the Secretary of the Interior should cause to be selected from other public land of the United States located nearest to tiers of sections specified in the grant, an equivalent amount of land in alternate sections or parts of sections, odd-numbered, to make up for land so disposed of or reserved; that if any land in the grant had already been reserved to the United States by any act of Congress or in any other manner by competent authority for the purpose of internal improvement, such reserved portions would be reserved from the operation of the Act, but that the railroad should then have a right-of-way across such reserved lands, subject to the approval of the President. The Act then provided that the even-numbered sections remaining in the United States within 10 miles on each side of the road and its branches *should not be sold for less than double the minimum price for public lands* and should not be sold at private entry until first offered at public sale to the highest bidder at or above the increased minimum price of $2.50 per acre; that actual *bona fide* settlers under pre-emption and homestead laws might, after proof of settlement, improvement, cultivation, etc., purchase such land *at the increased minimum price*. The act also provided that when the Governor of Kansas should certify to the United States Secretary of the Interior that any 20 consecutive miles of either of the roads or branches had been completed, and the Secretary was satisfied that the State had complied with the Act, the State might cause to be sold all the lands situated opposite to and within the limit of 10 miles of the line of the completed roads. The bill was passed with very little debate and was signed by the President on March 3, 1863.

The other bill noticed by Senator Lane of Kansas on the same day (December 8, 1862) was a bill authorizing the Secretary of the Interior to treat with the several Indian tribes of Kansas for the purpose of bringing about their removal from that State. On January 26, 1863, Senator Lane requested that the Senate consider his bill which he characterized as "one little bill * * * that will excite no discussion * * * providing for the extinction of Indian titles in Kansas and the removal of the Indians from said State." It appears that the Commissioner of Indian affairs had recommended that the bill be amended to substitute the President of the United States for the Secretary of the Interior as the one authorized by the bill to enter into the treaties. Contrary to Senator Lane's expectations, the bill caused a fair amount of discussion. First, it was objected that this bill was contrary to the Government's policy with respect to Indians and would involve huge expenditures. To this Senator Lane and Senator Harlan replied that no expense would be involved since "It is expected that if the Indians agree to remove to the Indian territory, their lands can be sold for enough to defray the expenses of the removal." It was also pointed out that the superintendents and agents of the Government now in the field would be used by the Commissioner to negotiate the treaties and that the whole matter would come back to the Senate as a matter of course for its approval. With respect to the Government's official policy regarding Indians, which was somewhat in conflict with this proposal, Mr. Lane made the following remarks, in justification of the proposals in his bill:

"Mr. President, I have here a map of Kansas, showing our condition with regard to these Indian reservations. The Indian reserves are in the midst of our settlements. Lawrence, the town where I live, is within five miles of an Indian reserve on one side, within twelve miles of an Indian reserve on another, and within a mile of another. The Indians themselves are anxious to be removed. They have appointed committees, and have opened a correspondence with the tribes south of us. There is, south of Kansas, an Indian territory of seventy-eight thousand square miles, sufficient to accommodate every Indian east of the Rocky mountains. All the treaties with the Indians of that territory are void because of their action in this rebellion. Congress has heretofore authorized the President of the United States to declare these treaties void. * *

The Indians of Kansas are placed in a pitiable condition at the present time. They are surrounded by the whites pressing upon them from all sides, destroying them. There is another feature in connection with this subject. By improving the lands adjoining these reserves we are increasing the price of them for ourselves upon ourselves. They are to be purchased by our sons and our neighbors, the residents of Kansas; and I think it is unjust. As an instance of how they have raised, take the Delaware reserve, the largest of the reserves; and today, hard as the times are, and dangerous as is the condition of our country, I have no doubt their lands, if put up for sale, would bring from four to seven dollars an acre from our own people, every dollar of which we have made them by our improvements. Our people are dissatisfied with this state of things." [Cong.Globe, Vol. 63, 37th Cong., 3d sess., p. 506.]

Mr. Pomeroy remarked that the Indians of Kansas were indeed in a bad way, that when he had first visited the Osage Indians there had been at least five thousand of them but that "they are now reduced to about three thousand."

Mr. Fessenden had the following comments to make on the bill and its purposes:

" * * * But, sir, I desire to enter my protest against what seems to be one argument of the Senator from Kansas, [Mr. Lane] and that is, that all the rights, and all the justice, to be considered with reference to questions of this sort, are to be reserved exclusively for the whites, and that the Indians do not seem to have any rights in relation to the matter. I regard them as under the protection of the Government; and because the whites have chosen to go into their section of country and settle upon lands and improve those lands and make settlements, I do not think it follows if, in consequence of that, the value of lands owned by the Indians and reserved for their use is increased, that therefore that value should accrue to the whites and not to the Indians themselves. I do not accede to the correctness of such an idea at all, if that was the idea which my friend from Kansas meant to suggest. If any man chooses to come into my neigh-

borhood and settle, and by his improvements increase the value of the land which I occupy, it does not follow that he has a right to take that land from me or compel me to sell it to him; and I think the same rule holds with reference to colored people, whether they are of African descent or native Indians, precisely, in relation to that matter.

* * * I will ask my friend from Kansas [Mr. Pomeroy] suppose you remove them to the Indian territory, how long will it be before the whites encroach on them there, and we shall be called to make a territory and then a State, and the little feeble remnant of them must go still further into the wilderness?

"Mr. Pomeroy. Mr. President, the policy which I would inaugurate would be to consecrate this Indian country forever to the Indians.

"Mr. Fessenden. Exactly; but have not these reservations for the use of the Indians been consecrated forever in the same way as much as the Indian territory can be?

"Mr. Pomeroy. But the construction we have upon it has been that "forever" means until the white people want it.

"Mr. Fessenden. Exactly; and you will consecrate the Indian territory in the same way—until the white people want it.

"Mr. Pomeroy. No, sir; I would consecrate it until eternity begins.

"Mr. Fessenden. If that could be done, though I do not see the slightest probability of its being done, I would say put them in that territory and protect them there. What has been our experience on this question? The Indians have been step by step removed. We make reservations in a Territory or State for the Indians; we inaugurate a policy; we say, hereafter the policy of the Government is to be this; white people are not to go on the reservations; they are to be forever for the use of the Indians; the Indians are to be protected there forever; to be Christianized and made a part of ourselves. The time comes when the whites surround them and want their lands. They say they do not get Christianized fast enough; the process is not sufficiently rapid to suit their pur-

poses; the Indians yet remain semi-barbarians; you do not get the whole of them civilized; there are a few left who adhere to their idols, and, therefore they must be removed to a new territory, somewhere else, which is to be consecrated to their use, forever, which means, perhaps for a generation—some fifteen years. Well sir, if that is to go on; if it is necessary; if such is the state of things in this country that we cannot be Christians except so far as suits our own interests, let us understand it, and the sooner the Indians are exterminated, perhaps the better for them. [Cong.Globe, Vol. 63, p. 506.]"

Mr. Lane, of Kansas, had no more to say about the fact that the reservations were getting too valuable to leave in the possession of the Indians, and Mr. Doolittle then proceeded to another argument for the removal of the Indians from Kansas, that is, "to preserve the race from being overwhelmed and corrupted by the vices of the whites faster than they are improved by their virtues." In reply to this Mr. Collamer suggested that if such were the case, perhaps the Senate should be considering "a law to civilize the people of Kansas."

A further objection made to the bill was that it was an unnecessary measure because the President already had the treaty making power and did not need an Act of Congress to direct the making of these treaties.

On January 27, 1863, the bill (S. 413) was read the third time and passed. However, instead of being enacted as a separate bill, it was incorporated as sections 4 and 5 of the Act of March 3, 1863, an act making appropriations for the current and contingent expenses of the Indian Department, H.R. 731, 12 Stat. 774. With respect to sections 4 and 5 of this Act, p. 793, Mr. Doolittle on February 25, 1863, remarked "They make no appropriation. They merely provide for the negotiation of treaties for the removal of the Indians from Kansas.' They are precisely similar to the bill which passed the Senate a short time since." (Cong.Globe, Vol. 64, p. 1282.) The two sections read as follows:

"Sec. 4. *And be it further enacted,* That the President of the United States be, and is hereby, authorized to enter into treaties with the several tribes of Indians, respectively, now residing in the State of Kansas, providing for the extinction of their titles to lands held in common within said State, and for the removal of such Indians of said tribes as hold their lands in common to suitable localities, elsewhere within the territorial limits of the United States, and outside the limits of any state.

"Sec. 5. *And be it further enacted,* That the President of the United States be, and is hereby, authorized to enter into negotiations, by treaty or otherwise, with such loyal tribes, or the loyal portions of such tribes, now residing in the country south of Kansas and west of Arkansas, commonly known as the 'Indian Country' as may be necessary in order to secure for the Indians of Kansas who shall be removed to said Indian country under the provisions of the preceding section of this act, the title to the lands to which they may be so removed."

At the time of the passage of the appropriation bill Mr. Fessenden objected to the incorporation of these two sections on the ground "that it is burdening down these appropriations bills with all sorts of legislation."

In line with the desire of the Kansas legislators to extinguish Indian title to Kansas lands, United States Indian commissioners and agents were negotiating with the Osage, and on August 29, 1863, a treaty was signed which has been described in detail earlier in this opinion. Pursuant to Article 1 of that treaty the Osage ceded to the United States a 30 by 50 mile tract in Southeastern Kansas, most of the odd-numbered sections of which were already embraced in the grant to the State of Kansas for railroad purposes by the Act of March 3, 1863, 12 Stat. 772. The cession was an outright sale of the tract for $300,000, or approximately 34 cents per acre. The annual report of the Commissioner of Indian Affairs in 1865 indicates that the Osage had withdrawn to the diminished reserve shortly after ex--

ecuting the treaty in 1863 and that the white settlers immediately began settling upon the tracts embraced in Articles 1 and 2.

On February 9, 1864, the Kansas legislature passed an act accepting the railroad grant provided for in the Act of March 3, 1863, 12 Stat. 772, and designated the Leavenworth, Lawrence & Kansas Railroad Co. to build the road from Leavenworth to the southern line of the state and to receive the grant of land upon the prescribed terms and conditions. The authorized route of the road passed through the lands described in Article 1 of the unproclaimed Osage treaty. On July 2, 1864, the Senate ratified, with certain amendments, the treaty of 1863 with the Osage, and on September 29, 1865, a new draft of the amended treaty was signed by the Osage at Canville Trading Post, Kansas. This draft contained the same consideration for the Article 1 lands mentioned in the 1863 treaty, that is $300,000, but it included for the first time the civilization fund language as follows:

"Said lands shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws, but no pre-emption claim or homestead settlement shall be recognized: and after reimbursing the United States the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, the remaining proceeds of sales shall be placed in the treasury of the United States to the credit of the 'civilization fund,' to be used, under the direction of the Secretary of the Interior, for the education and civilization of Indian tribes residing within the limits of the United States.

On April 11, 1866, Father John Shoenmaker of the Neosho Catholic Mission, wrote to Elijah Sells, Superintendent of Indian Affairs, urging that the Treaty of September 29, 1865, be ratified by the Senate. He stated that he realized that it would probably be impossible to remove the whites from the 30 by 50 mile tract ceded in Article 1 "there being no less than 2,000 White Settlers on it, and there are still more on the Cherokee Neutral land, whilst the influx daily increases." He warned that hostilities would result if something were not done. On April 23, 1866, Superintendent Sells forwarded the letter to Commissioner Cooley stating, "The Osage Indians begin to distrust the good faith of the Government, because they are told that they cannot receive their annuities, arising from the sale of their land, because the Treaty has not been ratified by the Senate, whilst the cession of land proposed in the treaty, is already overflowing with the impatient White Settler."

On June 26, 1866, the Senate amended Article 2 of the treaty as hereinbefore mentioned, to provide that the trust lands must be sold for $1.25 per acre rather than have the price left to the discretion of the Secretary of the Interior. This amendment also meant that the diminished reserve must sell for $1.25 per acre, should the Osage elect to withdraw to the Indian Territory. The Senate also amended Article 1, to insert in the civilization fund provision, the language italicized as follows:

"Said lands shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws, *including any act granting lands to the State of Kansas, in aid of the construction of a railroad through said lands,* but no pre-emption * * *."

It is worthy of note that the Senate resolution providing for the amendment by the insertion of this language was submitted by Senator Doolittle, who had participated in the Senate discussions concerning the Act of March 3, 1863, 12 Stat. 772, providing for the grant of this very land to the State of Kansas for the purpose of building a railroad. S. Ex. Journal, Vol. 14, U. S. Senate 1866, Pt. 2; Cong. Globe, Vol. 63, 37th Cong., 3d sess. p. 1158.

On July 26, 1866, Congress passed an act, 14 Stat. 289, similar to the Act of March 3, 1863, 12 Stat. 772, granting to

408

the State of Kansas certain odd-numbered sections in the tract of land described in Article 1 of the yet unproclaimed treaty of September 29, 1865, to aid in the construction of a southern branch of the Union Pacific Railway and Telegraph from Fort Riley, Kansas, to Fort Smith, Arkansas.

On January 21, 1867, the Osage treaty of September 29, 1865, was finally proclaimed by the President. On January 2, 1868, a map of the definite location of the railroads through the tract ceded by Article 1 was filed in the General Land Office. On January 21, 1868, the Commissioner of the General Land Office directed the Register and Receiver of the proper office to *withdraw from sale all the odd-numbered sections within ten miles of each side of the line of the road.*

During the summer of 1868 negotiations were commenced between the agents of the United States and the Osage nation for the so-called Drum Creek Treaty. The Missouri, Fort Scott and Santa Fe Railroad Co., and the Leavenworth, Lawrence & Galveston Railroad Co., each wanted a treaty negotiated with respect to the Diminished Reserve lands and also the trust lands (already disposed of by Article 2 of the 1865 treaty), whereby the two railroads could acquire such land for a very small price. The treaty as finally submitted to the Senate also contained a provision referring to the lands ceded by Article 1, and providing that the proceeds from the sale of such lands should be used for the exclusive benefit of the Osage Indians. In the course of the treaty negotiations, an Osage Indian, named Beaver, pointed out to the negotiators that the white settlers had moved on to the Neosho Valley ceded land before it had been paid for by the Government, and that the Osage objected. In a letter dated April 13, 1868,[6] from Representative Sidney Clarke (Kansas) to N. G. Taylor, Commissioner of Indian affairs, Mr. Clarke, in discussing the Drum Creek treaty negotiations and the extinguishing of the remaining Indian title to Kansas land, stated:

" * * * The settlers on the land ceded and sold by the treaty, proclaimed January 21, 1867, are yet without titles to their homes. A joint resolution has been passed by the House of Representatives for the relief of these settlers, and is now pending in the Senate. I appeal to your commission to meet the settlers referred to in full and free conference; and in the treaty you are about to make, provide for the full recognition of their rights, as you have abundant power to do, and thus settle the question, already too long at issue, in the interests of justice."

The above passage apparently has reference to the provision in Article 1 of the Osage treaty of 1865, that no pre-emption or homestead rights should be recognized in the ceded tract and it was the Congressman's hope that the new treaty *would* recognize such rights.

It was felt by Congress that under such a treaty the railroads in question would be acquiring valuable lands for an exceedingly nominal figure and that settlers in turn would be forced to pay far more than the Government minimum price of $1.25 per acre for the land so acquired. The treaty was roundly denounced and was not ratified.

The record indicates that the land in the tract ceded by Article 1 was placed on sale for the first time by the Government in 1868. During that year the Government sold 21,902.60 acres at $1.25 per acre. The record does not reveal the location of the land so sold. On March 11, 1869, Senator Pomeroy of Kansas introduced in the Senate a Resolution (No. 19) providing for the purchase by actual settlers of certain lands of the Osage Nation. On March 19, 1869, Mr. Pomeroy reported the Resolution from the Committee on Public Lands with amendments. On April 1, 1869, debate began on the Resolution (Cong.Globe, Vol. 89, p. 412). As introduced and amended the Resolution then provided that when public sale was made of Article 1 and Article 2 Osage lands, any actual settler who at the date of the sale should be

6. H.R.Ex.Doc. 310, Pt. 3, 40th Cong., 2d sess., p. 28.

residing on any portion of the land, not exceeding 160 acres, who had made improvements, was a citizen or had declared his intention to become one, should have the privilege of purchasing such land for $1.25 per acre and be entitled to purchase such land for $1.25 per acre in four annual installments of 25% of the purchase price in each installment, paying interest at 5% on the unpaid balance. The resolution provided that both odd- and even-numbered sections should be offered for sale under the terms of this Resolution if "they shall not have been reserved and set apart under the existing law, for the purpose of aiding in the construction of any railroad through the land." Mr. Harlan (Iowa) asked Senator Pomeroy whether or not the resolution embraced the odd-numbered sections included within the limits of a railroad grant, and Senator Pomeroy (Kansas) replied that there was some question as to whether the railroad company was actually entitled to those sections or not; that if the railroad was so entitled, they could not be sold under the resolution which would then apply only to the even-numbered sections. "If the Department [of the Interior] decide that it [the railroad] has not a right to them, then the whole of the land is to be sold." (Cong. Globe, Vol. 89, p. 413.) Senator Harlan thought the resolution should be amended to make the price for the land $2.50 per acre, and stated:

" * * * The Senate may not be aware of the fact that the land referred to in this resolution is a strip of about twenty miles by fifty in width on the east end of the Osage lands. The United States bought the land of the Indians and have paid them for it, or put the money to their credit, and it was hoped the Treasury would be reimbursed by the sale of the lands; but either a bill passed or the treaty was so amended as to permit a railroad company to take one half of the land on the usual conditions of increasing the price of the remaining sections to $2.50 an acre.[7] Now, if the even sections are to be sold at $1.25, and the railroad should gain the other sections for nothing, I am not sure that the Treasury would be reimbursed. [Cong.Globe, Vol. 89, p. 413.]"

Senator Pomeroy assured Mr. Harlan that the Treasury would be amply reimbursed if only the even-numbered sections reserved to the Government should be sold for $1.25 per acre. However, the Senate amended the resolution to provide that the land must be sold by the Government for $2.50 per acre. On April 6, it appearing that the House would not agree to the Senate amendments to the resolution, the Senate asked for a conference and Mr. Pomeroy, Mr. Harlan, and Mr. Davis (Kentucky), were appointed from the Senate. On April 8, the House agreed to the conference and appointed Mr. Julian (Indiana), Mr. Clarke (Kansas), and Mr. Swann (Maryland), managers for the House. On April 9, the report of the committee of conference revealed the following compromise: the Senate receded from the $2.50 price and agreed to a price of $1.25; the House receded from the four-year interval for completing payment and agreed to permit only two years for payment, to be made in equal installments; it was agreed to insert the following provision: "Provided however, that nothing in this act shall be construed in any manner as affecting any legal rights heretofore vested in any other party or parties." The Joint Resolution No. 18 was concurred in and became law on April 10, 1869, 16 Stat. 55. As passed, the Joint Resolution provided that *bona fide* settlers residing on any portion of the lands sold to the United States by virtue of Articles 1 and 2 of the Treaty of September 29, 1865, with the Osage Nation, should be entitled to purchase up to 160 acres of such land at $1.25 per acre, within two years from the passage of the Joint Resolution, under such rules and regulations as might be prescribed by the Secretary of the Interior; that both odd- and even-numbered sections should be subject to settlement and sale; that the 16th and 36th

7. This apparently has reference to the amendment of 1866 by the Senate in Article 1, referred to above and mentioning the grant of land to railroads under some law.

410

sections in each township of the lands should be reserved to the State of Kansas for school purposes; that nothing in the act should be construed to affect legal rights already vested. There was no mention in the debates on this Resolution concerning the prohibition in Article 1 of the 1865 treaty against recognition of pre-emption rights in the Article 1 tract, and this Resolution in effect provided for the recognition of such rights. It was not until the debate on the Act of August 11, 1876, that this matter was discussed. Much later it was recognized that the granting of the 16th and 36th sections in the Article 1 tract to Kansas for school purposes was also a violation of the Osage treaty, and ultimately the civilization fund was credited with $1.25 per acre for such land so granted.[8]

Entries were immediately made by settlers under the provisions of the Joint Resolution on both odd- and even-numbered sections but the entries on the odd-numbered sections were set aside and vacated on January 16, 1872, by the Secretary of the Interior, who had decided that two railroads[9] had title to the land in the odd-numbered sections. Presumably the 46,029.80 acres sold in 1869, the 145,687.11 sold in 1870 and the 140,954.08 sold by the Government in 1871 all in the Article 1 tract (Commission's finding No. 6) were located on even-numbered sections. The Secretary's action in vacating the entries on all odd-numbered sections in January 1872, threw the settlers in this area into a turmoil and only 2,667.10 acres were sold by the Government in that year.

In the meantime, the Kansas representatives in Congress were pushing further legislation for the benefit of settlers on the ceded tract. On March 1, 1871, the House of Representatives objected to and passed over Senate Resolution 266, which purported to extend the two-year time limit for disposal of the ceded tract land, as set forth in the Joint Resolution of 1869, and to apply the townsite laws of the United States to the ceded tract.

However, in the Indian Department Appropriation Act of March 3, 1871, 16 Stat. 544, there appeared a proviso, page 557 that the laws of the United States relating to townsites be extended over all the lands obtained from the Osage Indians in the State of Kansas. The townsite laws, Act of March 2, 1867, 14 Stat. 541, and the Act of June 8, 1868, 15 Stat. 67 provided that if any portion of the public lands of the United States had been or should be settled and occupied as a townsite and therefore not subject to entry under agricultural pre-emption laws, if the town should be incorporated, the corporate authorities, or if not incorporated, the county judge, might enter at the proper land office at the applicable minimum price the land so settled and occupied, in trust for the use and benefit of the occupants according to their respective interests. The acts limit the amount of land to be purchased in accordance with the number of inhabitants of the town. The latter act provided that the parties availing themselves of these acts must pay, in addition to the applicable minimum price, the costs of surveying and platting the townsites and the expenses incident thereto incurred by the United States, before any patent might be issued. It appears that prior to the passage of the Act of March 3, 1871, about five towns were flourishing on the Article 1 tract and again we have a law providing for the sale of this land at a providing for the sale of this land at a set price of $1.25 per acre notwithstanding the fact that the treaty provides that the land is to be sold on "the most advantageous terms."

By 1871, the Leavenworth, Lawrence & Galveston Railroad Co. had completed its road through the ceded, Article 1, tract plus about 20 miles of road south of the tract. By the Act of April 19, 1871, 17 Stat. 5, the line was permitted to relocate any portion of its road it wished south of Thayer within the limits of its grant without enlarging or diminishing the grant.

8. Act of June 16, 1880, 21 Stat. 291.

9. Leavenworth, Lawrence and Galveston Railroad Co., and Missouri, Kansas and Texas Railroad Co.

On September 21, 1871, the Governor of Kansas certified to the Secretary of the Interior that the road had been constructed and equipped as required by the Act of March 3, 1863, and that a map of the road had been duly filed. Certified lists of the odd-numbered sections of land within the railroad limits were made by the proper authority in Washington, D. C. On April 8, 1872, and later on March 21, 1873, the Governor of Kansas issued to the railroads patents for the lands in the ceded tract coming within the grant. At about the same time the Missouri, Kansas & Texas Railroad Co. completed its road through the actual tract and received its patents, pursuant to the Act of July 26, 1866, 14 Stat. 289.

With the patenting of the odd-numbered sections in the Article 1 tract to the railroads and the decision of the Secretary of the Interior that no patents should issue to settlers under the Joint Resolution of 1869 on the odd-numbered sections patented to the railroads, the settlers on those odd-numbered sections brought suit against the two railroads on the theory that the railroads did not have good title to the land, that title had remained in the United States and the lands could therefore be patented to settlers under the terms of the Joint Resolution of 1869. Because of the federal question involved, the suits were brought in the name of the United States as a suit to confirm and establish the title of the United States to the odd-numbered sections in the ceded tract claimed by the railroads to have been granted to Kansas for railroad purposes and subsequently patented to the railroads pursuant to the Act of March 3, 1863; and to enjoin the railroads from setting up any right or claim to such lands. Plaintiffs in the suit contended that the lands covered by the lists were not embraced by the grant in aid of the construction of the railroads. The railroads contended that the Act of March 3, 1863, and the subsequent Treaty of 1865 with the Osage, were

together effective to pass title to the odd-numbered sections in the ceded tract to Kansas, pointing out that Section 4 of the Indian Department Appropriation Act, passed on the same day as the railroad grant act, clearly showed congressional intent to extinguish Indian title to the lands so granted. The railroads further pointed out the Senate amendment to the Osage Treaty in Article 1, wherein it was provided specifically that the lands in the ceded tract should be sold under existing laws "including any act granting lands to the State of Kansas, in aid of the construction of a railroad through said lands * * *."

The Circuit Court and later the Supreme Court [10] both held that no part of the Article 1 lands passed to Kansas under the Act of March 3, 1863, 12 Stat. 772, or the Act of July 26, 1866, 14 Stat. 289, pointing out that the Osage at both times had good title to that land pursuant to the Treaty of June 2, 1825, 7 Stat. 240, wherein the Osage reserved this particular tract (among others) to be theirs as long as they might choose to occupy the same; that the United States could not survey such land until the Indian title was extinguished and that until such time as it was extinguished, the grant could not include such lands; that the railroads were prohibited from negotiating with the Indian owners and that the Court would not presume that Congress would transfer the possessory right to Indian lands to a railroad or to Kansas before itself acquiring them, since this would be a "poor way of observing a treaty stipulation." There was a good deal of language in the Court's decision about the purity of the motives of Congress respecting Indians, but the Circuit Court indulged in some interesting speculation regarding the reason for the amendment to the first article of the 1865 treaty to include mention of a railroad grant in that tract. The court said:

10. United States v. Leavenworth, Lawrence & Galveston R. R. Co., 26 Fed.Cas. No. 15,582, pages 901, 906; affirmed, 92 U.S. 733, 23 L.Ed. 634; United States v. Missouri, Kansas & Texas R. R. Co., 26 Fed.Cas.No.15,786, page 1275; affirmed, 92 U.S. 760, 23 L.Ed. 645.

"* * * I have no hesitation in expressing my belief that the senator, whoever he may have been,[11] that suggested that amendment, had in his mind the act [of March 3, 1863, granting the land to Kansas] which we have already construed, and that his purpose was to incorporate into the treaty a recognition of the validity of the grant, so that the treaty should not defeat it. There may have been in his mind, there probably was a doubt of the right of congress to make such a grant in the face of the treaty of 1825. The treaty now under consideration, originally presented to the senate, provided for the sale of all these lands, and for the disposition of all the money arising from such sales, in a manner inconsistent with such a grant. With these two treaties staring him in the face, he must have felt the doubt whether the grant, even if by its terms it had included these lands, would be upheld as valid. To remove the argument which might be drawn from this treaty as originally made, it was easy to induce the senate and the Indians to recognize any right which may have been acquired by that act, or any other which was an existing law when the treaty was ratified by the senate. In consenting simply to this, the senate would feel that no wrong was done, because no new right was conferred by or concealed in the amendment. At the same time, as the new words introduced designated no specified statute or law, the attention of the senate was not, probably, directed to this particular statute. But as no other law was then in existence, so far as is shown to us, which, by remotest inference, granted lands to aid in constructing a road through these lands, I must believe that the framer of the amendment had this one in his mind.

"The true intent and meaning of the clause in the mind of the senate seems to have been this: That, as the treaty directed all these lands to be sold, and made provision for the disposition of all the proceeds, and, as it was suggested that there might be a railroad grant or grants which covered some of the lands thus directed to be sold, this provision was inserted to remove or prevent a conflict between the treaty and the statute, if any such existed." United States v. Leavenworth, Lawrence & Galveston R. R. Co., 26 Fed.Cas.No.15,582, pages 901, 906.

The court then concluded that although Congress intended that the treaty with the Osage should not destroy any existing rights, Congress did not intend by the treaty to declare what rights did exist nor to construe the statutes on which those rights might depend nor to create any rights in that regard that did not exist independent of the treaty. Both courts concluded that the Article 1 tract was land "otherwise reserved" within the meaning of the Acts of March 3, 1863, and July 26, 1866, and thus excepted from the operation of the grants since this land had been "otherwise reserved" by virtue of the Treaty of June 2, 1825, with the Osage. Neither court attempted to gloss over the fact that Congress, Kansas, the Secretary of the Interior, and the railroads, all believed and acted on the belief that the Article 1 lands, lying in the odd-numbered sections on either side of the roads, had passed to the State of Kansas for the two railroads. The courts simply held that everyone (except the settlers bringing the suit) was wrong with respect to the legal effect of the grant acts and the amendment relative to railroad grants in Article 1 of the subsequent treaty with the Osage. Naturally, if Congress and Kansas had realized that none of the Article 1 lands passed under the terms of the grant act, sections in other than the Article 1 tract lands would have been included in the lists and patented to the railroads when the roads were completed. In its statement of facts, the Circuit Court had the following to say:[12]

---

11. As pointed out earlier in this decision, the Senator was Mr. Doolittle who had participated in the Senate debates concerning the Act of March 3, 1863, 12 Stat. 772, under which act Leavenworth claimed title to the land.

12. The Circuit Court was speaking as of June, 1874. United States v. Leavenworth, Lawrence & Galveston R. R. Co., 26 Fed.Cas.No.15,582, pages 901, 902.

"On the 10th day of April, 1869, congress passed an act authorizing bona fide settlers upon any lands ceded to the United States by the treaty proclaimed January 21, 1867, to purchase the same in limited quantities, within two years, at $1.25 per acre, whether odd or even numbered sections, saving, however, the legal rights of others, 16 Stat. 55. Under this joint resolution a large number of settlers went on the land, made the required improvements, proved up their settlements before the local office, paid their money and received their certificates of entry. Three hundred and fourteen thousand, two hundred and twenty-eight acres of this land was entered under this joint resolution, and the settlers thereon, in addition to the fees and expenses of entering the same, paid the government therefor the sum of $454,072,100. Nearly all the rest of these lands have been settled upon; some under the joint resolution, by persons who were not able to make payment within the two years it was in force, and others under the belief that the trust specified in the Osage treaty, that these lands were to be sold on the most advantageous terms for cash, would be carried out by the government, and that consequently they would be able to purchase their lands for cash when the government executed the trust. There are between thirty thousand and forty thousand of these settlers upon the land in controversy, who are indirectly interested in the result of the present suits.

"The entries of the land under the joint resolution have been ordered to be set aside and cancelled by the secretary of the interior, on the sole ground that these railroads had a prior grant of these lands. They have nearly all been cancelled, and are being cancelled as they are reached in the regular course of business in the land department. The interior department at different times has been divided in opinion whether the railroad grants include the land in question."

As a result of the Supreme Court decisions, in 1875, settlers on the odd-numbered sections whose patents had been refused them by the Secretary of the Interior, were able to obtain title to their land. However, many other titles to land in the tract became worthless as a result of the decisions. Those titles were the ones held by the railroads and by purchasers from the railroads, whose claims had been upheld by the Secretary of the Interior. Also, certain townsite corporations had purchased land from the railroads. To remedy this situation, Senator Ingalls of Kansas introduced in the Senate a bill, which later became the Act of August 11, 1876. This act was characterized by the Indian Claims Commission as a bill to stimulate sales in the Article 1 tract where the land was apparently undesirable and little in demand. Senator Ingalls outlined the facts leading up to the Leavenworth and Missouri suits, noting that the Secretary of the Interior, believing that the grants of lands lying in the ceded tract and located directly upon the route of the railroads, had become operative upon the proclamation of the Osage treaty, had issued patents to the State of Kansas which were then transferred to the railroad companies as their roads were constructed; that a very large number of people from all parts of the country had emigrated to Kansas and purchased land on the tract from the railroads and that at least six towns with populations of from a thousand to five thousand inhabitants each had purchased land from the railroads. He then stated that the decision of the Supreme Court had divested all these people of their rights in their land and said, "It therefore becomes necessary that some method should be devised by which these purchasers can obtain title to their property *by paying for it over again*. That is all they ask, and this bill is to carry out the provisions of the treaty which provides for the disposition of these lands by the United States." (Cong.Rec.— Senate, July 20, 1876, p. 4748.) Senator Ingalls also revealed that some of the purchasers from the railroad companies had paid the full price, that others had not completed their payments, but that all had made extensive improvements and that many had purchased much more than

160 acres of land each. During the debates on August 1, 1876 (Cong. Rec.— Senate, Aug. 1, 1876, p. 5038), Senator Booth remarked that he knew of one person who had purchased 800 acres from the railroad in the ceded tract a number of years before and had made very valuable improvements on such land, worth at least $40,000 alone, and that under the provisions of the pending bill such a settler could only purchase 160 acres of such land at $1.40 per acre. Mr. Booth considered this provision of the bill most unjust. Mr. Ingalls stated that to provide otherwise permitting the purchase of tracts larger than 160 acres, would be contrary to the land policy of the United States which strongly favored single settlements of 160 acres each. Mr. Booth felt, however, that in view of the fact that these purchasers had bought their land from the railroads with the express approval and aid of the Department of the Interior, and that every official act necessary to give them notice that title was rightly in the railroads had been done by the United States, simple justice required a deviation from the well-established land policy of the Government in this case. Mr. Ingalls went on to say that the tract in question covered two counties and portions of two or three others; that the tract had been settled for seven or eight years and was at the time he spoke one of the most prosperous, enterprising, and industrious communities in Kansas.

Another troublesome point that the Senate felt must be adjusted, was the fact that the Joint Resolution of 1869 had granted, free, the 16th and 36th sections in the tract to the State of Kansas. It was believed under the reasoning of the Leavenworth case and the terms of the Osage treaty, that the land would have to be sold by the Government and the proceeds placed in the civilization fund. The bill also provided that out of the $1.40 to be paid by those settlers who found themselves with worthless title to the land in the odd-numbered sections, fifteen cents should be set aside to pay the private attorneys who conducted the litigation brought in the name of the United States to clear the title to the other group of settlers who had attempted to acquire the odd-numbered section land under the Joint Resolution. After much debate it became apparent to all that whatever price was fixed, the funds received would *all* be impressed with a trust for the civilization fund, and that it was scarcely just to require the losing parties in the Leavenworth lawsuit to pay the counsel fees of the successful litigants. Mr. Edmunds (Vermont) stated that the provision would not only be unfair to the purchasers from the railroad but also to all subsequent purchasers of the lands. To this Mr. Ingalls replied that there was a settler on every quarter section of the land already and it was thus all occupied.

Next, Mr. Edmunds questioned the right of Congress to stipulate in the pending legislation any set price for the land embraced in Article 1 of the Osage treaty since the treaty provided that the land should be sold "on the most advantageous terms" possible. He then stated that the Joint Resolution passed in 1869 was in direct violation of the treaty wherein Article 1 provided that pre-emption rights would not in the future be recognized in that tract, and was also in violation of the direction in the same article that the land be sold for the best price that could be obtained. Senator Edmunds was of opinion that the settlers who purchased their lands under the Joint Resolution for $1.25 per acre (which lands had become very valuable because the railway had been laid across and near them), should, if they wished to keep the lands, pay an additional price to the Secretary of the Interior representing the true worth of such lands. Senator Edmunds further stated that the civilization fund provision was for the benefit of the Osage Indians as well as for other Indians and that if the pending bill was to vary the terms of Article 1 of the Osage treaty by permitting the sale of the land at a nominal fixed price, the consent of the Osage Indians, at least, should be obtained before the provision could take effect. Said Senator Edmunds, somewhat prophetically:

"* * * If we fail to do that, the result will be, as experience has shown in other cases, it is inevitable morally that the Indians by and by will come back to Congress and say, 'Here we have got a great claim against the United States; these lands instead of having been worth $1.25 or $1.40 an acre, were really and honestly worth to the settlers themselves, over and above all improvements, $2.50 or $3 or $5, depending upon location; and as the United States has violated the trust, the United States must make up to the Indians and to the civilization fund the sum that is thus deficient.' [Cong.Rec.—Senate, July 20, 1876, p. 4751.]"

Later in the same debate, Senator Edmunds said:

"* * * Here if there is anybody in the world we ought to keep faith with—it appears to me we ought to do it with everybody—it is with people who are not able to protect themselves, but who are not intelligent enough to understand that there may be sometimes violations of rights without intending it. We have promised these Indians that homestead and pre-emption rights should not be allowed in these lands; we have said to them 'we will take them and sell them for your benefit, for cash, under the direction of the Secretary of the Interior on the most advantageous terms.' That is the solemn contract we made with them. Have they not a right to rely upon our good faith to carry it out? [Cong.Rec.—Senate, July 21, 1876, p. 4780.]"

Later, Senator Conkling, referring to the proposal to set aside 15 cents of the purchase price to be paid for the lands in order to pay the attorney fees of the successful litigants, said:

"By our act we take fifteen cents out of this land. We take it at our peril, and the Indians not being privy to that, the question is whether they have not a claim against us, as far as Indians have a claim against anybody and especially against the United States, to make that good. That is a very awkward question. [Cong. Rec.—Senate, July 28, 1876, p. 4926.]"

Ultimately, the provision for the payment of attorneys' fees out of the proceeds from the sale of the Article 1 lands was eliminated, but the bill then provided for the sale of this land to holders under the railroads, to the railroads, to townsite companies and to the "squatters" claiming under the Joint Resolution of 1869, who had been prevented from securing their patents by the action of the Secretary of the Interior, all for the same fixed price of $1.25 per acre. Mr. Thurman pointed out that this provision for selling the land at $1.25 per acre was as much a violation of Article 1 of the Osage treaty as had been the Joint Resolution of 1869. Finally the Senate accepted Senator Edmunds' amendment that the consent of the Indians must be obtained before the act could become effective. This amendment was later stricken, however, and in protest against such action Mr. Howe stated:

"The objections that I have to voting for this report are that I understand the effect of it will be first to sell to a given number of individuals lands at $1.25 an acre which in fact are worth from $10 to $20 an acre. The other objection I have is that I understand it to be in direct contravention of a treaty of the United States which obliges you, if you can be obliged by treaty—upon which point I express no opinion—to sell these lands in a fair market at a fair cash price. There is another provision in it that is less objectionable, and that is that you propose to sell on time. * * *

"* * * from the language of the treaty when I read it, I came to the conclusion that the United States had assumed the obligation of disposing of these lands at a fair price, in a fair market, and turning them into money, and dedicated that money to a specific use; and now this bill, as I understand, in utter disregard of that provision, proposed to sell the lands at an even sum of $1.25 an acre, and to do that on time. [Cong.Rec.—Senate, Aug. 5, 1876, p. 5197.]"

In defense of the bill as it was finally passed not requiring the consent of the Indians, but setting the price at $1.25 per

acre and allowing 4 years within which to complete payment, Senator Kernan said, in part:

"* * * Large numbers of settlers acting under this resolution [of 1869] of Congress on the one side, and acting under this patent of the lands to the railroad company on the other, had in good faith entered on these lands, contracted or paid for them, and made improvements. Now it is said we should not confirm their title without having also the assent of the Indian Tribe, for the reason that we were bound to sell these lands for the best price we could, as other public lands have been sold. Therefore it will be observed that if we do not confirm these titles we ought certainly make some compensation to these settlers, so it seems to me. We cannot say to them "Although you have gone on and bought from us and bought from our grantee, in form at least, we will now turn you out and the land shall not be sold unless the Indians consent or unless we sell them at public auction for cash as an ordinary trustee would." In my judgment the Indians have never understood that these lands were to be disposed of differently from other lands. The price has uniformly been, I believe, $1.25 an acre. The government has been allowing these lands to be entered at $1.25 an acre. We inquired from those living in Kansas who know all about it whether this Indian tribe had ever made the slightest objection to the mode in which the Government has been disposing of these lands for years or allowing entries to be made for years. We were informed by a gentleman who is familiar with it, who has been a judge in that State, that there has never been a suggestion that the Government was not dealing with the Indians fairly in regard to these lands. * * * Therefore I do not think the law unjust to the Indians. I think the treaty has been carried out as they understood it, by selling the lands in the ordinary way, at the ordinary Government price. * * * Moreover, it seems to me under existing circumstances, after what the Government has done, having allowed men to enter upon these lands * * * and become grantees under pat-ents from the Government on one side, and allowed others to go there and enter upon them and contract and purchase and pay for them under the joint resolutions of Congress on the other, that if we have wronged the Indians we must protect the settlers who make improvements and let the Indians make their claims and then we can deal justly with them. [Cong.Rec. —Senate, Aug. 1876, p. 5197–8.]"

Senator Edmunds of Vermont disagreed that the consent of the Osage could be implied from their failure to protest the Joint Resolution of 1869 or the Government's mode of selling the land, not to the highest bidder for cash, but at $1.25 and on time. "They (the Osage) had a right to repose upon the good faith of this nation and do not lose anything by not making a perpetual clamor about it." Mr. Edmunds refused to sign the conference report which was nevertheless concurred in by the Senate and, on August 11, the President signed the bill.

The Act of August 11, 1876, 19 Stat. 127, provided in substance (1) that any bona fide settler residing at the time of completing entry, as provided in this act, on any portion of the lands sold to the United States by virtue of Article 1 of the Treaty of September 29, 1865, was entitled to purchase up to 160 acres of such land within one year of the passage of the act and under the terms of the act set forth in Section 3, and that such settlers should not be denied these rights on the ground that they had heretofore had the benefit of the homestead or pre-emption laws of the United States; (2) that any person who in good faith had purchased any portion of the Article 1 land from either the Leavenworth, Lawrence and Galveston Railroad Co., or the Missouri, Kansas and Texas Railroad Co., prior to the commencement of the two suits in the name of the United States against the two companies to test the legality of the title of the two railroads to this land (that is prior to Feb. 25, 1874), and could prove to the land office that all or part of the purchase price had been paid, and that improvements had been made on the land, might purchase 160 acres of such land to

include their improvements, on the terms provided in section 3; that the rights of the purchasers from the railroads should attach as of the date of payment to the railroads, provided the claimant had actually resided on the land at the time of entry made under the act; that these rights would also attach to the heirs of any deceased purchaser from the railroads; (3) that persons making entries within 12 months of the passage of the act could purchase the land for $1.25 per acre under regulations of the Commissioner of the General Land Office, one-fourth of the price to be paid at the time of entry, and the remainder in three annual installments with interest at 5% per annum, the Secretary of the Interior to issue patents upon complete payment; that persons failing to make entries within 12 months should forfeit any land claimed except in cases where title to the land was in contest; that any purchaser might pay the entire purchase price at any time; that the federal laws of townsites were applicable to Article 1 lands upon the filing of the necessary declaratory statements within 60 days of the passage of the act; the occupants of such townsites were to be allowed to purchase 320 acres actually occupied, except where the townsite companies had purchased all claim to title from the original settlers, and all titles claimed by the railroad companies, in which case the townsite companies should have the same right to enter the lands that the original settlers would have had, in quantities not to exceed 800 acres, for $1.25 per acre, in accordance with section 3; (5) that all lawful entries on Article 1 lands which had been set aside or cancelled by the Secretary of the Interior on the ground that the railroads had a prior grant, should be reinstated by the Secretary subject to any valid claim that might have accrued before or since the sale cancellation;[13] (6) that declaratory statements might be filed by settlers who were already on the land and by those who might settle on the land after the passage of the act; (7)

that Kansas had the right to tax the lands from and after the making of the first payment under the act; (8) that the railroad companies might purchase in the manner provided in section 3, such subdivisions of lands located outside of their right-of-way [14] occupied by them on April 10, 1876, for stockyards, storage-houses, or for any other purposes legitimately connected with the operation of the roads, whenever the same did not conflict with a settler who in good faith had made a settlement prior to the occupation of the land by the railroads.

From the Senate debates on the above act, it appears that purchasers from the railroads had bought, in some instances, far more than 160 acres of land. Under the provisions of this act they could only keep 160 acres which they must now buy from the Government. On December 29, 1876, Mr. Ingalls of Kansas submitted to the Senate the following resolution which was considered and agreed to by unanimous consent:

"Resolved, That the Secretary of the Interior be directed to report to the Senate what portions or tracts of the Osage ceded lands in Kansas the Leavenworth, Lawrence, and Galveston Railway Company, or the Missouri, Kansas, and Texas Railroad Company claim to have sold prior to the 25th day of February, 1874; and that if such information be not in his office, he be directed to call upon said Railroad companies for the same, specifying the description of the land sold, the date of the contract of sale, the name of the purchaser, the consideration named, and the amount actually paid, and the sums that remain due thereon. [U.S.Senate, Cong.Rec., p. 388, 44th Cong., 2nd sess.]"

On February 13, 1877, the President pro tempore laid before the Senate a letter of the Secretary of the Interior transmitting the requested information which had been obtained from the Leavenworth, Lawrence & Galveston Railroad Company, and on February 21, 1877, a similar report was

---

13. This refers to entries on odd-numbered sections made under the Joint Resolution of April 10, 1869, 16 Stat. 55.

14. The grant to the railroad was finally characterized as a right-of-way, as a result of the Supreme Court decision.

submitted with respect to the Missouri, Kansas and Texas Railroad Company. Both reports were referred to the Committee on Public Lands and ordered printed. They appear as Senate Executive Documents 35, Parts 1 and 2, 44th Congress, 2d Session.

These reports show that the Leavenworth, Lawrence and Galveston Railroad Co. sold 13,080.14 acres of land (excluding town lots) for $87,765.98, an average price of $6.71 per acre, and it also sold 14 town lots of undisclosed acreage for $4,183.79 (town lots vary greatly in size). The Missouri, Kansas, and Texas Railroad Co. sold 29,263.71 acres including 42 town lots for $176,696.32, an average price per acre of $6.04. These sales were made between the time the land began to be patented to the railroads late in 1871, and February 25, 1874. Individual sales ranged in price from $2.25 to over $20 per acre for unimproved land. There is no question that the railroads sold this land on the "most advantageous terms" obtainable.

On June 16, 1880, Congress passed an Act, 21 Stat. 291 "to carry into effect the second and sixteenth articles of the treaty" of September 29, 1865. The act provided, among other things, that a settlement should be made with the civilization fund, Article 1 by the Secretary of the Interior with respect to the 16th and 36th sections of land in the ceded tract which had been improperly donated to the State of Kansas for school purposes by the Joint Resolution of April 10, 1869. The Act of June 16, 1880, did not state the price per acre which was to be credited to the civilization fund for such donated lands, but merely provided that the Secretary must account for the number of acres of Osage lands alienated by the United States by sale or otherwise (in this case a free grant to Kansas) and of the money received for such land. The Secretary was to certify the difference between the fund so received and the amount that would have been due at the date of the account if all the land had been disposed of "as provided for by said treaty." Inasmuch as Congress had consistently acted as though the Government was under no duty to sell

the land for any price but $1.25 per acre, the accounting was probably made on that basis. The amount to be credited to the civilization fund was to be less the expenses to the Government of survey and sale. On September 1, 1880, $55,664.49 was credited to the civilization fund. Presumably this amount represented the price of the lands at $1.25 per acre, less the expense of survey and sale, provided for in the Act of June 16, 1880. The total acreage in the Article 1 tract could have comprised about 39 townships of 22,040 acres each. However, certain townships were only partially in the tract. Assuming that two sections from each of 36 townships were donated to the State of Kansas for school purposes, approximately 45,480 acres were so donated. At $1.25 per acre, the sum received would have been about $56,750.00 without deduction for expenses of survey and sale. The amount actually credited to the civilization fund on September 1, 1880 "to proceeds of sections 16 and 36 within the Osage ceded reservation, Act of June 16, 1880." was $55,664.-49.

The facts recounted in detail establish certain historical facts which are important to the question now under consideration. In 1863, Congress passed two acts; one authorized the negotiation of treaties which would extinguish Osage title to Kansas land; the other prematurely granted certain of such land to the State of Kansas for railroad purposes. Negotiations between the United States and the Osage Nation, beginning in 1862, culminated in the proclamation of a treaty in 1867 by which the Osage ceded some 1500 square miles of land in exchange for, inter alia, the Government's agreement to sell the ceded land upon the open market for the best available price, all rights of pre-emption and homestead to be denied. In the meantime, the Osage, acting in the belief that the fulfillment of the contemplated bargain would lead to their immediate financial relief, began to withdraw from the area in question as early as 1863, and settlers immediately availed themselves of the better portions of the vacated land. By 1869 these settlers were firmly

entrenched and their representatives in Congress were able to secure passage of a joint resolution providing for the donation of certain treaty land to the State of Kansas for school purposes, and for the sale to settlers of other land at the bargain price of $1.25 per acre, with two years to pay. This resolution provided for the disposition of land contrary to Article 1 of the treaty of 1865; further, it dealt with land already included, in part, in Congress' 1863 grant to Kansas for railroad purposes. By 1871, the railroads involved had completed their Kansas lines and had been granted patents under the 1863 Act, and were selling part of their land to others. The United States Land Office, in the meantime, refused to grant settlers patents, as seemingly authorized under the Joint Resolution of 1869, in cases where the same land had been granted to the railroads in 1863. Eventually, certain settlers pressed suit which reached the United States Supreme Court and settled the question of these land titles. The Supreme Court held the titles of the railroads and their vendees void inasmuch as the United States had not then owned the land it purported to grant in 1863 (title being in the Osage until proclamation of the Treaty of 1867). To assuage the clamor of the holders of these most valuable roadside plots, Congress granted relief by an 1876 Act allowing those whose title had been divested by Supreme Court decision to buy in the land they then held at $1.25 an acre, payable in four annual installments. Others were allowed to purchase unclaimed sites on the same terms and Kansas was allowed to purchase, at the same price, the 16th and 36th sections on this tract previously dedicated to school purposes. The amounts received less expenses, were deposited in the civilization fund. No attempt was ever made by the Government to dispose of this land on the open market for cash at the most advantageous price obtainable.

In view of all the preceding facts, the situation with respect to the disposition of the land in the ceded tract assumes a rather different aspect than the one indicated by the Commission's finding 6, and by its opinion in which it concludes

that there was little demand for the lands and the sales were slow.

With respect to land sales and demand, it appears that from the date when the land was first opened to settlement in 1868, up to 1875, the Secretary of the Interior was of the opinion that all land lying in the odd-numbered sections in the Article 1 tract had passed by the grants contained in the Act of March 3, 1863, 12 Stat. 772, and the Act of July 26, 1866, 14 Stat. 289 to the State of Kansas for railroad purposes. In spite of the Joint Resolution of April 10, 1869, 16 Stat. 55, the Secretary refused to issue patents to settlers on the odd-numbered sections. Presumably, therefore, the sales by the United States listed in the Commission's finding 6(a) between 1868 and 1875 were all sales of land on even-numbered sections and consisted of sales of some 358,041.27 acres. In addition, pursuant to the same Joint Resolution, at least 45,000 acres from even-numbered sections (the 16th and 36th in each township in the ceded tract) were donated free to the State of Kansas. Thus, by 1875, the United States, through the Secretary of the Interior, had disposed of about 86 percent of all the land in the tract that the Secretary believed was available for the Government to dispose of. More significantly, as early as 1871, the Government had disposed of 354,503.39 acres of the 432,965.15 it thought it controlled. The remaining 3,467.68 acres were sold when the whole matter of title was in litigation. That litigation and the Congressional debates on the Act of August 11, 1876, indicate that several thousand settlers had taken up land on the odd-numbered sections pursuant to the Joint Resolution of 1869 and had been unable to secure patents for their land from the Secretary of the Interior. In addition, a number of persons who had settled on the even-numbered sections had been unable to meet the payments within the terms of the Joint Resolution and were thus unable to secure their patents since their right to purchase the land lapsed with the expiration of the two-year time limitation specified in the Resolution. The Act of August 11, 1876, provided for the relief

of both classes of settlers. It would therefore seem that by 1871, or within four years from the time the land was opened for settlement, nearly all the land which the United States believed it had the power to dispose of had been disposed of. With respect to the land on the odd-numbered sections, as mentioned above, several thousand squatters were on such land claiming the right to purchase it under the Joint Resolution. Between 1871 and 1874, the two railroads received their patents to the land in the odd-numbered sections and sold something in excess of 42,343.85 acres for an average price of more than $6.00 per acre. The large number of sales by the Government after 1876, as shown by the Commission's finding 6, were undoubtedly sales of land in the odd-numbered sections which had already been purchased once from the railroads, land settled and claimed by squatters under the Joint Resolution, land occupied by the railroads for stockyards, etc., and some land on even-numbered sections claimed by persons who had not been able to comply with the terms of the Joint Resolution with respect to the time within which payment had to be made.

On the question of demand for the lands, the facts, both of record and of which we may take judicial notice, indicate a vigorous demand for this land, much of which was actually settled before the Osage title was extinguished. With respect to the market value of this land, the Government sales were uniformly at $1.25 per acre, and the railroad sales averaged over $6.00 per acre. However, it is quite apparent that the $1.25 did not necessarily bear any real relation to the true value of the land at the time of sale. It is clear that the Government never attempted to sell the land "on the most advantageous terms" as directed by Article 1 of the Treaty, nor did it observe the prohibition against the recognition of pre-emption and homestead rights. The debates on the Joint Resolution of April 10, 1869, indicate that there was no thought that the price set ($1.25) represented the market value of the lands which all considered to be worth much more. The real

purpose of the Resolution seems to have been to give the Kansas settlers a bargain both in price and in the terms of payment. Again, when, in clear violation of the terms of the treaty, the Act of August 11, 1876, set the price of this land at $1.25 with four years to pay, no one pretended that such a price represented anything like the value of these lands. It is common knowledge that the prospect of a railroad in an area increases the demand for, and the value of, such land. When the railroad is actually built, those portions through which it runs increase greatly in value by virtue of the road and the towns that spring up along the line. In this case the railroad's route was known in 1863, two years before the treaty was signed. The treaty was proclaimed in 1867 and the land opened for settlement the following year. Four years later both roads were complete and at least five or six towns were thriving in the tract. In addition to the railroad a river flowed through the tract which contained much valuable agricultural land. Admittedly, some of the land was probably far better than other portions, but it would appear, under all the facts, that the average value of all the land in 1865 was at least the $1.25 price the Government got for the land, and it was probably worth much more. In fact, at the time the unratified treaty of 1863 was signed, the fact that two railroads would cross the tract was known, and the enabling act itself bound the Government to accept no less than $2.50 per acre for the land lying in the even-numbered sections. Shortly after the signing of the 1863 unproclaimed treaty the Osage withdrew to their diminished reserve and the white settlers immediately began to pour onto the ceded Article 1 tract.

We have no difficulty in concluding that the fair value of the land in question in 1865 was greatly in excess of 34 cents per acre and that the payment of 34 cents per acre for this land, under the circumstances outlined in the previous pages, was unconscionable. We must presume that the agents who negotiated the original treaty, in August of 1863, were aware of

the Act of March 3, 1863, providing for the grant of half of this land to the State of Kansas for railroad purposes and knew that the land would be very valuable. One of the purposes in passing the other Act of March 3, 1863, 12 Stat. 774, to extinguish Indian title to this land as soon as possible, was that the value would be increased by the white man's improvements, and unless the Indians ceded this land at once, a much larger price would have to be paid them for it. By September 1865, when the treaty was finally signed, white settlers, undoubtedly lured by the prospect of the railroad and by the fertility of the land for agricultural purposes, had already moved on the land. The Senate itself with respect to the trust lands and the diminished reserve lands set the price at $1.25, yet these lands were admittedly not as valuable as the lands in the Article 1 tract. The fact that subsequent legislation set the price of the ceded lands at $1.25 per acre, in 1869 and 1876, was due to the earnest efforts of the Kansas representatives in Congress to benefit the white settlers and to secure them a bargain in land by acts that were not only in the face of the Osage treaty, but contrary to the express terms of the Act of March 3, 1863, granting the odd-numbered sections to Kansas and providing that the even-numbered ones should sell for no less than $2.50 per acre. There is no indication that the land would not have sold for $2.50 per acre, but rather that the benefit of a lower price was to be conferred upon the settlers.

The disparity in price between 34 cents per acre paid to the Osage and the then market value of the land, as hereinbefore indicated, was great. The Commission and the appellee urge, however, that there must also be evidence that some person acting for the Government, deceived or misled the Osage Indians as to the value of their land, or "indeed, had knowledge of any fact bearing upon its value that was not well known by plaintiffs when they made the settlement and gave the release." Klamath and Moadoc Tribes of Indians v. United States, 296 U.S. 244, 56 S.Ct. 212, 217, 80 L.Ed. 202.

In the instant case, the Indian Claims Commission states, page 5 of its opinion: "* * * The record discloses no deception, overreaching or other perverse conduct on the part of the representatives of the Government, either in the preliminary discussions or in the actual consummation of the treaty."

Appellants urge that no showing of actual fraud is required for relief on the grounds of unconscionable consideration. There are cases which seem to support both views, but it appears that only where the inequality of the bargain is very gross, does disparity of price alone justify a conclusion that the consideration was unconscionable. As to what is "very gross," the courts have provided no exact formula and each case must be carefully considered on its own particular facts and circumstances.

We have already said that the disparity between the price paid and the fair value of the land, as shown by recorded facts, was great. Turning to evidence indicating overreaching, we are faced first with the fact, admitted by the Commission and the appellee, that appellants were blanket Indians, at best semi-civilized, and, at the time the treaty was negotiated, existing in the most dire poverty and distress. Land was their only asset but they could not sell it except on terms prescribed by the Government. The proximity of the growing white settlement had driven off the game on which they had long subsisted. Their need of money and food was pressing and immediate. To them land meant a place in which to roam and hunt game. They appreciated the fact that their land was valuable but in no sense could they stand on an equal footing with the agents of the Government to conclude a business deal. On the other hand, the opening of eastern Kansas to white settlers and the building of railroads was a matter of extreme importance to the Federal Government and to the State of Kansas. It seems obvious from the record that the Government agents in eastern Kansas knew in 1863 that this land was to be in great

demand, and certainly by 1865 when the treaty here involved was concluded, the fact that two railroads would cross the ceded tract was no secret to Government officials having to do with Indian affairs in eastern Kansas or with public lands in that area.[15] If these Indians had been more versed in the ways of "civilization" or had been represented, as were some other tribes, by astute white attorneys, it would have been impossible to seriously suggest that 34 cents an acre was a fair price for this land. In this case we are convinced from the record that the agents acting for the United States in the negotiation of this treaty had, both in 1863 and subsequently, knowledge of facts bearing upon the value of this land that was not known by the Osage, and this fact, coupled with the very low price placed upon the land by those agents, results in unconscionable consideration having been paid the Osage for the land embraced in Article 1 of their treaty.

In view of the facts and circumstances disclosed by the record and the historical facts of which we take judicial notice, relating to the fair value of the lands in question, we are of the opinion that the finding of the Commission that the fair value of the lands was not in excess of the sum of $300,000 paid therefor, is not supported by substantial evidence. We are further of the opinion that the price of 34 cents an acre paid was unconscionable consideration for such lands.

With the treaty so revised on the ground of unconscionable consideration, appellants are entitled to an award representing the fair actual value of the land on September 29, 1865, which we have concluded was greatly in excess of the 34 cents per acre paid therefor, less the $300,000 already paid to appellants, and less the expenses of survey and sale which the parties have agreed amount to $24,372.20.

In its opinion the Commission further said, in support of its conclusion that 34 cents per acre was adequate consideration of the land in question, that—

"* * * The record does not disclose the cost of administering the cession [under Article 1] during the first sixteen years the Government was disposing of the land, except $3,177.22 for 'expense of sales' paid out of the 'Civilization Fund,' but the expense to the Government in administering the cession and handling the thousands of sales must have been enormous."

Exactly what these "enormous" administrative expenses were the Commission does not explain and on that point the record is silent. The appellee made no attempt to prove what it considered to be the actual value of the land, but took the position that such land was worth at least what the Government received for it. According to Article 1 of the treaty, the Government expected and believed that it would get the land described in Article 1 without cost to it other than some departmental administrative expense, which in all probability was not materially increased because of this treaty. The Government believed that it could, and it actually did, reimburse itself for the expenses of survey and sale and for the amount of $300,000 to be paid to the Osage, and have a very substantial net sum left over for other uses. Fair and honorable dealing required the guardian not to profit so greatly as the Government did in this case at the expense of its ward, an unlettered and uninformed people.

It should be noted that under the laws relative to the disposition of public lands, the purchasers were often required to pay fees over and above the price of the land, which fees were to be used for the purpose of defraying the expenses of the Government incident to the particular manner of disposal of the land. If the lands in question had been sold by the Government in the manner provided in the treaty, for cash at public sale on the most advantageous terms, with no homestead or pre-emption claims recognized, we do not believe the expenses, over and above the costs of survey and sale, and fees paid to the officers of the land dis-

15. The Osage Indians had withdrawn from the tract through which the railroads were to pass, as early as 1863, following the signing of the first draft of their treaty, and had settled on their diminished reserve.

tricts, would have been very large. The Government's expense in maintaining a department to supervise the *installment* sales of the land in question is not, we think, properly chargeable to the Osage, even if the amount of such expense had been properly proved, which it was not. The treaty expressly forbade the sale of this land on an installment basis and the appellee quite properly did not contend that it was entitled to be reimbursed for such expense.

Undoubtedly the cost of disposing of the land on the installment basis and for the benefit of the white settlers of Kansas rather than as provided in the treaty, was considerable. What it was we do not know, but we do not believe that any part of it, actual or estimated, is chargeable against the amount ultimately found to be due appellant.

### Fair and Honorable Dealings

Appellant's third ground for recovery is based on clause (5) of section 2 of the Indian Claims Commission Act which provides:

"claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

The Commission has ruled as a matter of law that clause (5) is not applicable to appellant's case for the reasons: (1) that the remedy provided for in clause (5) is exclusive; (2) that the word "recognized" means "triable" and that if a case is actually triable under any existing rules of law or equity, clause (5) cannot be applied to it; (3) that appellant's case both by pleading and evidence comes squarely within the provisions of the rules of law and equity set forth in clause (3); (4) that to grant relief in this case under clause (5) would, in any event, necessitate going behind the express provisions of the treaty or completely disregarding them, a course not authorized by clause (5). In effect the Commission appears to hold that appellant cannot plead in the alternative and that if by its pleadings it states a case coming within the requirements of any of the other clauses of section 2, it

may not plead clause (5); that if it does so, the Commission may disregard such plea even though the trial of the case fails to develop facts sufficient to prove a case for relief under the other provisions of the section.

We find nothing in the Indian Claims Commission Act that requires a petitioner to plead under but one clause of section 2. Modern theories of pleading as exemplified by the Federal Rules of Civil Procedure, 28 U.S.C.A., emphasize the importance of the philosophy that the pleadings of the parties shall be construed to do substantial justice. A facet of this philosophy is Rule 8(e) which provides that a party suing in a civil action may plead alternatively or hypothetically and the failure of one cause of action shall not serve to defeat the other cause of action.

The rule making power of the Indian Claims Commission would not seem to be so broad as to allow it to refuse to consider a matter properly presented to it by the pleadings upon a technicality of common law pleading long since discarded by the Federal Courts, and no such rule of the Commission has been called to our attention. Ordinarily, administrative or quasi-judicial tribunals such as this Commission, employ more flexible procedure than is employed in the courts.

In the instant case appellant in its petition set forth certain facts which it expected to prove and urged that they fell within the provisions of clause (3) relative to unilateral mistake and unconscionable consideration. It also alleged that those same facts brought its case within the terms of clause (5). If plaintiff had proved to the satisfaction of the Commission the facts alleged, and the Commission had rendered a judgment based on unilateral mistake or unconscionable consideration, there would have been no need for it to have considered appellant's claim under clause (5). Unconscionable consideration having as an element overreaching or fraud, would, of course, not comport with fair and honorable dealings, but appellants are entitled to and are only requesting, one judgment in this

case, and if it had received that judgment under clause (3), any further decision with respect to clause (5) would have been surplusage. However, proof in a case which might in the opinion of the Commission fall short of proof of fraud, actual or implied, might well indicate a woeful lack of fair and honorable dealings, and where, as here, judgment was denied on the ground that fraud or unilateral mistake had not been proved, the appellant was entitled under the Act to have its claim tested by the yardstick of fair and honorable dealings. We cannot agree with the Commission that the word "recognized" was used in the sense of "triable." We believe it means that if, at the outset, a claim is not cognizable, or if at the trial it is not proved and, therefore, decided favorably to petitioner under rules of law and equity, then petitioner is entitled to have it considered under the fair and honorable dealings clause.

In this case the facts proved by appellant did not, in the opinion of the Commission, meet the strict probative requirements of fraud, unilateral mistake, overreaching, and the like. However, those same facts might spell out a situation wherein from a strictly moral point of view of honesty and fair dealing the agents of the Government could be said to have acted under the circumstances in a manner something less than fair and honorable. Because of the length of time that has elapsed since the occurrence of significant events in most Indian cases, exactness of proof is very difficult of attainment. Fraud and duress are not easy to prove under the most favorable of litigation circumstances, and in cases like the present where the events relied upon took place some 85 years ago, precise proof in the form of testimony and documentary evidence is usually scanty and on some points non-existent.

■■■■■ Under the facts and circumstances of this case, were we to agree with the Commission that appellant had not proved its case sufficiently under clause (3), we would be compelled, in view of the facts and circumstances disclosed by the

entire record, to conclude that appellant had proved adequate facts to entitle it to judgment under clause (5). Moreover, we conclude from the entire record that appellant acted properly and wisely in pleading its case under both clauses (3) and (5), since on the trial a failure to submit evidence sufficient to establish the exact proof required under clause (3) might well satisfy the less exacting demands of clause (5). The Commission was of the opinion that appellant had not made out a case under the provisions of clause (3), and it should, therefore, have considered the facts proved in the light of clause (5). In our opinion, the record in this case amply substantiates appellant's claim under clause (5).

## Interest

■■■■ On the question of appellant's right to interest on the award herein, we are of the opinion that on none of the three grounds advanced by appellant would a recovery bear interest. What we said in The Loyal Band or Group of Creek Indians, v. United States, Ct.Cl., 97 F. Supp. 426, regarding the awarding of interest by the Indian Claims Commission, is equally applicable to the instant case. This case does not involve a "taking" of appellant's property in the constitutional sense and the Indian Claims Commission Act contains no express provision for the payment of interest on awards made under clause (3) or clause (5) of Section 2 of the Act. The facts and circumstances of the case are not such as to warrant the allowance of interest on purely equitable grounds. Article 1 of the Treaty of September 29, 1865, as it has been revised to reflect the understanding of the Osage, provides merely for the deposit of $300,-000, to the credit of the Osage tribe, in the treasury of the United States and for interest thereon at the rate of 5 percent per annum, to be paid to the tribe semi-annually; and the net proceeds in excess of such sum from the sale of the lands were not to draw interest, but were to be used as they accrued, for the benefit of the Osage. Therefore, the treaty, as revised, does not provide for interest on the funds

paid into the so-called Civilization Fund to which we have decided the Osage were entitled.

The decision of the Indian Claims Commission is reversed, and the case is remanded to the Commission for further proceedings not inconsistent with this opinion.

HOWELL, and MADDEN, Judges, concur.

JONES, Chief Judge.

I concur in the conclusion reached by the majority. However, I cannot subscribe to all that has been said about our power to review the Commission's findings of fact. I agree that it is our duty as a reviewing tribunal to consider all the evidence in the record. If there is substantial evidence, when the record is considered as a whole, to support the Commission's findings, we may not disturb those findings even though we might have reached a different conclusion were we considering the evidence in the first instance.

There is a distinction, a very real area of difference, between trial *de novo* and inquiry as to whether the findings below are supported by substantial evidence. The majority do not agree that they have come too close to the forbidden boundary of that area. But I cannot agree that the court has not gone beyond the simple question of whether there is substantial evidence to support the Commission's findings.

In my judgment the Indian Claims Commission cannot be treated as a purely administrative agency. The wording of the statute creating it convinces me that the Congress intended to give it more of the attributes of a court than of an administrative agency. Its functions are essentially judicial. I feel also that the wording clearly shows that it was not intended that the Court of Claims should go into the whole question on a *de' novo* basis if, after examining the entire record, it finds that there is substantial evidence to justify the conclusions which the Commission has reached.

For this reason, I do not think the principles so clearly enunciated in the Universal Camera case are entirely applicable to the Indian Claims Commission since that Commission has a somewhat different status from an administrative board, even though that board may be clothed with some judicial or quasi-judicial powers.

Congress made it very clear, however, that notwithstanding there might be substantial evidence to support the findings of the Indian Claims Commission, if, on examination of the entire record, the Court of Claims should conclude that in dealing with the Indians the transactions had not been on a fair and equitable basis, considering all the circumstances and the sense in which those expressions are used in the statute, we should invoke the provisions of clause (5). We would then have jurisdiction to allow recovery on the part of the Indians notwithstanding the record may show substantial evidence to support the findings of the Commission. Evidence which is substantial enough to preclude a reviewing body from upsetting a lower tribunal's findings of fact may not be enough to convince a court of conscience that the things done were done fairly and honorably.

The court has reversed the Commission's finding of value largely on evidence of which it has taken judicial notice, much of which apparently was not brought to the attention of the Commission. The case should be remanded for the Commission to consider the evidence now of record respecting lack of fair and honorable dealings after both parties have briefed and argued the question.

I conceive our function in reviewing conclusions based upon fair and honorable dealings to be quite different from our function in reviewing findings of fact in the ordinary sense. We sit on this phase of the case as a court of appeals in equity; in fact, our functions are larger even than that, for we, like the Commission, have cognizance of claims not heretofore recognized even in equity.

While I cannot join in holding that ordinary legal rules justify a decision that

there is no substantial evidence to support the Commission's findings, I do not feel so limited in acting under the fair and honorable dealings provisions of the act.

On this basis I agree with the conclusion reached by the majority.

WHITAKER, Judge (dissenting).

I am not persuaded that there is no "substantial evidence" to support the findings of the Indian Claims Commission. I agree with the Chief Judge in what he said in his concurring opinion relative to the weight to be given the findings of this Commission.

The defendant bought some eight hundred sixty-five thousand acres of land for 34 cents an acre. Over a period of about 12 years it sold about half of the acreage, and the balance in the next 20 years. These sales were on a four-year installment basis at $1.25 an acre. They were of 160-acre tracts. One hundred sixty acres is about one five-thousandth of the total acreage, and for each sale of one of these small plots the defendant got only four times what it paid for the plot on the basis of the purchase price of the whole 865,000 acres. A real estate man who buys a large tract of land and subdivides it expects to sell the individual lots for many times what he paid for them.

If the Indians had put their lands up for sale as a whole or in parcels I doubt that they could have done so well.